UNITED STATES of America, Plaintiff,

v.

Allen M. DORFMAN, Roy M. Williams, Joseph Lombardo, Thomas F. O'Malley, and Andrew G. Massa, also known as Amos Massa, Defendants.

No. 81 CR 269.

United States District Court, N. D. Illinois, E. D.

June 1, 1982.

352

Dan K. Webb, U. S. Atty., Douglas P. Roller, Gary S. Shapiro, Mark J. Vogel, Sp. Attys., Chicago Strike Force, Chicago, Ill., for plaintiff.

Albert E. Jenner, Jr., John C. Tucker, Michael J. Rovell, Robert T. Markowski, Linda L. Listrom, Jenner & Block, Chicago, Ill., for defendant Dorfman.

Thomas A. Wadden, William Krebs, Wadden, Scherr, Krebs & Gitner, P. C., Washington, D. C., for defendant Williams.

Harry J. Busch, Sherman Magidson, Chicago, Ill., for defendant Lombardo.

William Hundley, Lawrence Gondelman, Hundley & Cacheris, P. C., Washington, D. C., for defendant O'Malley.

George J. Cotsirilos, Robert M. Stephenson, Cotsirilos & Crowley, Chicago, Ill., for defendant Massa.

## MEMORANDUM OPINION

MARSHALL, District Judge.

Defendants are charged in an eleven count indictment with conspiracy to bribe a United States Senator in violation of 18 U.S.C. §§ 201(b)(1) and 371 (1976), travel in interstate commerce with intent to commit bribery in violation of 18 U.S.C. § 1952 (1976), and nine separate counts of wire fraud stemming from an alleged scheme to defraud the Central States, Southeast and Southwest Areas Pension Fund ("Fund") of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America ("Teamsters") of the loyal services of two of the defendants, and attempting to obtain money and property by means of false pretenses in violation of 18 U.S.C. § 1343 (1976). On December 9, 1981 we denied defendants' motions to dismiss the indictment. *See United States v. Dorfman*, 532 F.Supp. 1118 (N.D.Ill.1981). That opinion describes in detail the nature and scope of the charges against the defendants and we will not repeat the description here except where particular facts are relevant.

Pending before the court are defendants' motions to suppress evidence obtained by the government through electronic surveillance. The surveillance, which extended

over 14 months and produced more than 2000 reels of recordings, is the most pervasive of which we are aware. The motions are quite general but the briefs in support of them raise a plethora of statutory and constitutional contentions. All defendants have joined in the motions but they have filed separate briefs and supporting materials and occasionally press arguments relevant to only a single defendant. In general our decision on any given issue encompasses the arguments raised by all defendants; however, where necessary, we treat with particularity an argument raised by a single defendant or a discrete group of defendants.

The written materials submitted to the court by the defendants and the government consist of over 950 pages of briefs and over a thousand pages of supporting documents. In addition, 14 days of testimony was heard on certain issues.

While we have considered each brief and all the supporting material submitted by the parties, it would be both unnecessary and unworkable to respond to every question of fact and law joined by counsel. Our discussion will be restricted to those factual and legal issues necessary to resolve the questions set forth below. At the time of the evidentiary hearing we advised the parties that, on those issues, the only evidence upon which we would rely was the evidence offered and received at the hearing and not unproved allegations made by way of briefs or appendices.[1] We adhere to that position in rendering this decision.

## I

The arguments pressed by defendants in support of their motions to suppress break down into three categories: the sufficiency of the applications to and orders of the court authorizing the electronic surveillance at Amalgamated Insurance Agency Services, Inc. ("Amalgamated") under the probable cause standard of the fourth amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1976 & Supp.II 1978) ("Title III"); the good faith of the government in the representations made to the authorizing judge for purposes of securing the original warrant and extensions;[2] and the government's compliance during the course of the electronic surveillance with the requirements of Title III.

Defendants attack the original application and order of January 29, 1979, as well as extension applications and orders issued on March 1, March 30, April 7 and April 28. The law with respect to the issue of probable cause, the allegations of government misconduct and compliance with Title III is of course the same for each time period. However, defendants' attack is predicated upon facts often peculiar to particular applications or orders. Thus, while we set forth a general discussion of the law below, we treat separately the issue of probable cause and the challenge to the government's good faith as to each application and order.

## II

In late 1978, the United States Department of Justice and the Federal Bureau of Investigation ("the government") initiated an investigation of Allen Dorfman ("Dorf-

---

1. Defendant Dorfman and defendants Williams and O'Malley submitted voluminous appendices along with their pre-trial briefs. Defendant Dorfman's material consists of three Appendices (labeled I, II, and III), each in multiple volumes. In deciding questions of law, where no hearing was held or evidence received, we cite to the appropriate document as contained in the material compiled by Dorfman, i.e., 1 App. I, Order of March 1 at _____. On those issues covered by the pretrial hearing, we rely only on the evidence submitted by the parties and therefore all cites will be to appropriate exhibit numbers.

2. As is discussed in detail later in this opinion, on the issue of the government's good faith in submitting the applications and accompanying affidavits, or more accurately, the defendants' ability to demonstrate bad faith under the standards of *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), a hearing was granted as to the March 1 and 30 extension applications, but not the original application of January 29.

man") under the code name "Pendorf."[3] As part of the investigation, the government applied to Chief Judge James B. Parsons of this court for authority, under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510–20 (1976 & Supp.II 1978), to place a wiretap on the telephones at Amalgamated, which was Dorfman's place of business. The application was made and granted on January 29, 1979. Under the wiretap order issued by Chief Judge Parsons, the government was required to return to the court every thirty days in order to obtain authority to extend the tap.[4]

Defendants challenge the validity of the original January 29 order, as well as the extensions granted by Chief Judge Parsons on March 1 and 30, 1979. Defendants also attack the validity of an April 7, 1979 order which allowed the tap to be expanded to an additional telephone line at Amalgamated, and which authorized the placement of electronic listening devices in the offices of Dorfman and William Webbe, another employee of Amalgamated. Defendants do not specifically challenge the court orders which authorized electronic surveillance of Amalgamated after April 7, but do seek suppression of the results of the subsequent surveillance as fruits of a poisonous tree, *see generally Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); 18 U.S.C. § 2515 (1976).

■■■■ Defendants' basic attack on the surveillance orders is on two fronts. First, they claim that the applications for the orders which are the equivalent of warrants, were facially insufficient, in that the affidavits submitted to the court did not recite facts sufficient to create probable cause to authorize electronic surveillance. Second, they claim that the affidavits and applications contain intentional and/or reckless material misrepresentations of fact which void the warrants and require that the evidence obtained through the surveillance be suppressed under the rule of *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).[5] Before addressing the particular contentions ad-

---

3. "Pendorf" was a contraction of Penetrate Dorfman.

4. Under the statute, court orders may not authorize wiretaps lasting longer than thirty days. *See* 18 U.S.C. § 2518(5) (1976).

5. Chief Judge Parsons' orders also required that progress reports be submitted to the court every five days, in order to apprise the court of the results obtained thus far, and to show the continued need for interception. Defendants attack these reports, arguing that they contain misrepresentations and do not provide probable cause to continue the taps. It is doubtful that we have the authority to review the reports. Title III does not require progress reports, and leaves their use to the discretion of the judge who authorized the taps. *See* 18 U.S.C. § 2518(6) (1976). In *In re DeMonte*, 674 F.2d 1169 at 1174 (7th Cir. 1982), the court stated that review of progress reports should be left solely to the authorizing judge. The court cited *United States v. Ianelli*, 430 F.Supp. 151, 156 (W.D.Pa.1977). In *Ianelli*, the court wrote that Title III

makes no provision for the formal filing or presentation of the progress reports made to the supervising judge. It does not even require that they be written. It is our opinion that the supervising judge may handle these reports as he deems proper under the circum-

stances since they are merely aids in the overall supervision of the electronic surveillance. The reports are not statutorily required and the supervising judge is the proper party to determine whether they comply with his order permitting the telephone surveillance. Their sufficiency is a matter subject to the discretion of the supervising judge.

*Id.*

There is no statutory or constitutional requirement for the facial sufficiency of progress reports, so our review of them for sufficiency is impossible. Moreover, it is difficult if not impossible to determine whether misrepresentations in progress reports are material, since there is no requirement that progress reports be used at all, much less that they require termination of the tap if insufficient. While it is possible that egregious misrepresentations in progress reports might justify suppression under the court's supervisory power, *see generally United States v. Cortina*, 630 F.2d 1207 (7th Cir. 1980), suffice it to say we have found no such misrepresentations, and decline to further consider defendants' attacks on the reports. *See United States v. Scully*, 546 F.2d 255, 261–62 (9th Cir. 1976), *vacated on other grounds sub nom. Cabral v. United States*, 430 U.S. 902, 97 S.Ct. 1168, 50 L.Ed.2d 578 (1977).

vanced by defendants, we review the principles which underlie them.

### A

 It is now beyond question that the overhearing of conversations by means of electronic surveillance invades the expectations of privacy protected by the fourth amendment, and constitutes a "seizure" within the meaning of the amendment. *See Katz v. United States*, 389 U.S. 347, 351–53, 88 S.Ct. 507, 511–12, 19 L.Ed.2d 576 (1967). The fourth amendment requires that surveillance be authorized by a warrant issued by a neutral judicial officer. *See id.* at 354–59, 88 S.Ct. at 512–15; *Berger v. New York*, 388 U.S. 41, 54–55, 87 S.Ct. 1873, 1881–82, 18 L.Ed.2d 1040 (1967). This is because the Constitution demands that the difficult decision whether to invade the privacy interests protected by the fourth amendment should be made "by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). Consequently, interception of oral or telephonic communications by means of electronic surveillance which has not been authorized by a valid warrant must be suppressed under both Title III and the Constitution. *See* 18 U.S.C. § 2518(10) (Supp.II 1978); *Alderman v. United States*, 394 U.S. 165, 171, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969).[6]

 The text of the fourth amendment requires that warrants issue only upon "probable cause."[7] In order to determine whether the orders issued in this case were based on probable cause, we must review the applications and affidavits and determine whether they reveal facts and circumstances within the affiant's personal knowledge, or of which he had reasonably trustworthy information, sufficient to warrant a man of reasonable caution to believe that criminal activity was afoot. *Berger v. New York*, 388 U.S. 41, 55, 87 S.Ct. 1873, 1881, 18 L.Ed.2d 1040 (1967); *McCray v. Illinois*, 386 U.S. 300, 304, 87 S.Ct. 1056, 1058–59, 18 L.Ed.2d 62 (1967); *Beck v. Ohio*, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964); *Henry v. United States*, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959). Probable cause is only a reasonable probability of criminal activity; it does not require certainty or even a prima facie showing of criminal activity. *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969). Accordingly, defendants' position, often expressed in their analysis of the affidavits and applications for orders, that the presence of innocent explanations for much of the information presented in the applications (*e.g.* innocent business explanations of long distance telephone calls between Amalgamated and Nevada gambling casinos) vitiates the warrants, must be rejected. Even if there is an innocent explanation, as long as there is a reasonable probability that there is criminal activity afoot, despite the presence of other possibilities, probable cause is present. *See, e.g., United States v. Anton*, 633 F.2d 1252, 1254 (7th Cir. 1980), *cert. denied*, 449 U.S. 1084, 101 S.Ct. 870, 66 L.Ed.2d 808 (1981); *United States v. McLemore*, 573 F.2d 1154, 1157 (10th Cir. 1978); *United States v. Fury*, 554 F.2d 522, 531 (2d Cir.), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977).

---

**6.** However, the Constitution and § 2518(10) only permit an "aggrieved person" to suppress evidence. *See id.* 394 U.S. at 175 n.9, 89 S.Ct. at 968 n.9. This requires that the defendant seeking suppression be a party to the conversation the government seeks to use at trial, or that the conversation took place on his premises. *Id.* at 176–80, 89 S.Ct. at 968–70. To put it another way, a defendant may only suppress evidence which infringes his own expectation of privacy, and not the privacy of others. *See*

*Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 1035, 58 L.Ed.2d 387 (1978).

**7.** "The right of the people to be secure in their persons, houses, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S.Const.Amend. IV.

The probable cause determination is made by examining only the four corners of the application and affidavits. "It is elementary that in passing on the validity of a warrant, the reviewing court may consider *only* information brought to the magistrate's attention." *Spinelli v. United States*, 393 U.S. 410, 413 n. 3, 89 S.Ct. 584, 587 n. 3, 21 L.Ed.2d 637 (1969) (emphasis in original) (quoting *Aguilar v. Texas*, 378 U.S. 108, 109 n. 1, 84 S.Ct. 1509, 1511 n.1, 12 L.Ed.2d 723 (1964)).[8] Furthermore, when making the determination, it is important to construe the affidavits in a realistic and non-technical manner. *United States v. Harris*, 403 U.S. 573, 579, 91 S.Ct. 2075, 2080, 29 L.Ed.2d 723 (1971) (plurality opinion).

> If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

*United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965).

In Title III Congress codified the probable cause requirement with a three-tiered test. *See United States v. Armocida*, 515 F.2d 29, 35 (3d Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *United States v. Lyons*, 507 F.Supp. 551, 554 (D.Md.1981). The statute provides that an order may issue

if the judge determines on the basis of the facts submitted by the applicant that—

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such [oral or wire] interception;

. . . . .

(d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3) (1976).

The statutory standard is identical to the constitutional standard requiring reasonable grounds to believe that the tap will produce evidence of a crime. *United States v. Hyde*, 574 F.2d 856, 862 (5th Cir. 1978); *United States v. Fury*, 554 F.2d 522, 530 (2d Cir.), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977); *United States v. Armocida*, 515 F.2d 29, 36, 40 (3d Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *United States v. Falcone*, 505 F.2d 478, 481 (3rd Cir. 1974), *cert. denied*, 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975); *United States v. James*, 494 F.2d 1007, 1015 (D.C.Cir.1974); *United States v. Kleve*, 465 F.2d 187, 190–91 (8th Cir. 1972); *United States v. Baynes*, 400 F.Supp. 285, 295 n. 17 (E.D.Pa.1975), *aff'd mem.*, 517 F.2d 1399 (3d Cir. 1976); *United States v. DeCesaro*, 349 F.Supp. 546, 549 (E.D.Wis.1972), *rev'd on other grounds*, 502 F.2d 604 (7th Cir. 1974); *United States v.*

---

**8.** Since *Aguilar* and *Spinelli* seem to allow consideration of oral representations made to the issuing judge, on our motion we obtained transcripts of the colloquy between Judge Parsons and the government which occurred at the time applications were made, and made them available to defendants. This colloquy is also rele-

*Cantor*, 328 F.Supp. 561, 565 (E.D.Pa.1971), *aff'd*, 469 F.2d 435 (3d Cir. 1972).[9]

It necessarily follows from what has been said that an application for a Title III order or fourth amendment warrant is insufficient if it contains no more than conclusory statements indicating that the government agents believe they have probable cause. If this were enough, there would be no meaningful basis for review by a magistrate and the fourth amendment's protections would be secure only in the discretion of police officers, which is the very result the warrant requirement seeks to avoid. *Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964); *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). Accordingly, the application must contain sufficient underlying facts so that the magistrate can make an independent determination as to the existence of probable cause. *Ventresca*, 380 U.S. at 108–09, 85 S.Ct. at 745–46; *Beck v. Ohio*, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964); *Giordenello v. United States*, 357 U.S. 480, 486, 78 S.Ct. 1245, 1250, 2 L.Ed.2d 1503 (1958). However, once the magistrate or, in this case, the issuing judge has made the determination, it is entitled to deference from a reviewing court. *See Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969); *Aguilar*, 378 U.S. at 111, 84 S.Ct. at 1512; *Jones v. United States*, 362 U.S. 257, 270–71, 80 S.Ct. 725, 735–36, 4 L.Ed.2d 697 (1960).

Sometimes, direct evidence of observations of criminal activity is presented to the issuing magistrate in an application for a warrant. However, more often direct evidence is not submitted to the magistrate. Rather, hearsay is used; an affiant will report to the court information he has learned which leads him to believe that there is probable cause to issue a warrant. When hearsay is used a two-pronged test is applied: the application must set out the underlying circumstances from which the hearsay declarant, usually a government informant,[10] reached his conclusions, and it must set out underlying circumstances from which the affiant concluded that the hearsay informant is reliable. *See Spinelli*, 393 U.S. at 413, 89 S.Ct. at 587; *Aguilar*, 378 U.S. at 114–15, 84 S.Ct. at 1513–14.[11]

The first prong is directed toward the informant's conclusion that criminal activity is afoot and will be discovered by electronic surveillance. To satisfy this prong, there must be a reasonable probability that the interception will discover criminal activity. Mere suspicion is insufficient. *Spinelli*, 393 U.S. at 419, 89 S.Ct. at 590. Moreover, the activity that is alleged must be criminal; innocent activity, no matter how suspicious, is insufficient. *See Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam); *Spinelli*, 393 U.S. at 414, 418, 89 S.Ct. at 588, 590.

vant on the *Franks v. Delaware* issues discussed below.

**9.** In addition to the three probable cause requirements the statute mentions for an initial application for electronic surveillance, there is a fourth requirement when an extension of the original warrant is sought, that being a statement in the application setting forth the results thus far obtained from the surveillance, or a reasonable explanation of the failure to obtain results. *See* 18 U.S.C. § 2518(1)(f) (1976). "Plainly the function of § 2518(1)(f) is to permit the court realistically to appraise the probability that relevant conversations will be overheard in the future. If during the initial period, no communications of the kind that had been anticipated had been overheard, the Act requires an adequate explanation of the failure before the necessary findings can be made as a

predicate to an extension order." *United States v. Giordano*, 416 U.S. 505, 532, 94 S.Ct. 1820, 1834, 40 L.Ed.2d 341 (1974).

**10.** There is no requirement that the government reveal the identity of its informant. *McCray v. Illinois*, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); *Ventresca*, 380 U.S. at 108, 85 S.Ct. at 745; *Aguilar*, 378 U.S. at 114, 84 S.Ct. at 1514; *Rugendorf v. United States*, 376 U.S. 528, 533, 84 S.Ct. 825, 828, 11 L.Ed.2d 887 (1964). The government has not done so here.

**11.** The principles of *Aguilar* and *Spinelli* apply with full force to warrants under Title III. *See, e.g., United States v. Finn*, 502 F.2d 938, 940–41 (7th Cir. 1974); *United States v. DeCesaro*, 502 F.2d 604, 608 (7th Cir. 1974).

362

The inquiry is whether, assuming the veracity of the informant, there is an adequate basis for the informant's conclusion that criminal activity is afoot. *United States v. Button*, 653 F.2d 319, 323 (8th Cir. 1981) (citing 1 W. LaFave, Search and Seizure § 3.3 (1978)). The informant must indicate the source or basis for his knowledge, so that the magistrate can independently evaluate the reliability of the informant's conclusions. *Aguilar*, 378 U.S. at 112–14, 84 S.Ct. at 1512–13; *Giordenello v. United States*, 357 U.S. 480, 486–87, 78 S.Ct. 1245, 1250–51, 2 L.Ed.2d 1503 (1957). In short, the affidavit must indicate how the informant drew his conclusions, *see Spinelli*, 393 U.S. at 416, 89 S.Ct. at 589; *United States v. Button*, 653 F.2d at 323–24; *United States v. Karathanos*, 531 F.2d 26, 30–31 (2d Cir.), *cert. denied*, 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976); *United States v. Long*, 439 F.2d 628, 630 (D.C.Cir.1971), so that the magistrate can determine that the informant is acting on the basis of something more substantial than a casual rumor, *Spinelli*, 393 U.S. at 416, 89 S.Ct. at 589.

■ Defendants in the case at bar interpret the first prong to require that the affidavit specifically state what the informant "saw, touched, heard or smelled firsthand." Such a requirement is unnecessary, too strict, and at odds with *Ventresca's* prohibition of "[t]echnical requirements of elaborate specificity," 380 U.S. at 108, 85 S.Ct. at 745. As long as the context of the affidavit, read as a whole and in a commonsense fashion, reveals that the accusations are sufficiently detailed "that the magistrate may know he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based on an individual's general reputation," *Spinelli*, 393 U.S. at 416, 89 S.Ct. at 589, the affidavit is sufficient. The specificity defendants seek is not required if the context in which the charges are made provides a basis for crediting the accusations as substantial. *See United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971) (plurality opinion); *United States v. Landis*, 632 F.2d 66, 68 (8th Cir. 1980), *cert. denied*, 450 U.S. 918, 101 S.Ct. 1363, 67

L.Ed.2d 344 (1981); *United States v. Carmichael*, 489 F.2d 979, 981 (7th Cir.), *vacated in part on other grounds*, 489 F.2d 983 (7th Cir. 1973) (en banc); *United States v. Wilson*, 479 F.2d 936 (7th Cir. 1973) (en banc).

■ Whether there is a basis for relying on the information contained in the application and affidavit depends in part on its timeliness. Probable cause must exist at the time the magistrate issues the warrant, not merely at some point in the past. *Sgro v. United States*, 287 U.S. 206, 210, 53 S.Ct. 138, 140, 77 L.Ed. 260 (1932); 1 W. LaFave, Search and Seizure § 3.7(a) (1978). The affidavit must demonstrate that the information is not stale, for timeliness "cannot be left to mere inference or conjecture." *Sgro*, 287 U.S. at 211, 53 S.Ct. at 140; *see United States v. Boyd*, 422 F.2d 791 (6th Cir. 1970); *Rosencranz v. United States*, 356 F.2d 310, 317–18 (1st Cir. 1966); *Commonwealth v. Simmons*, 450 Pa. 624, 301 A.2d 819 (1973). This does not mean, however, that every item of information in the affidavit must be specifically dated. If the overall context of the affidavit indicates that the information is timely, the affidavit is sufficient. *See United States v. Dauphinee*, 538 F.2d 1 (1st Cir. 1976); *State v. McCormick*, 584 S.W.2d 821 (Tenn.Cr.App. 1979); 1 W. LaFave, *supra* p. 13 § 3.7(b). Context is critical as there are no hard and fast rules for staleness of information. Staleness can only be judged by reference to the particular type of crime. Thus, when the affidavit recites ongoing criminal activity of a type likely to continue over a substantial period of time, the timeliness of the information in the affidavit is less important. *See Andresen v. Maryland*, 427 U.S. 463, 478 n. 9, 96 S.Ct. 2737, 2747 n.9, 49 L.Ed.2d 627 (1976); *United States v. Button*, 653 F.2d 319, 325 (8th Cir. 1981); *United States v. Perry*, 643 F.2d 38, 50 (2d Cir.), *cert. denied*, 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981); *United States v. Webster*, 639 F.2d 174, 178–79 (4th Cir. 1981); *United States v. Vazquez*, 605 F.2d 1269, 1281–82 (2d Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979); *United States v. Weinrich*, 586 F.2d

481, 491–92 (5th Cir. 1978); *United States v. Brinklow*, 560 F.2d 1003, 1005–06 (10th Cir. 1977); *U.S. v. Kirk*, 534 F.2d 1262, 1274 (8th Cir. 1976), *U.S. v. Steeves*, 525 F.2d 33, 38 (8th Cir. 1975); *United States v. Rahn*, 511 F.2d 290, 292 (10th Cir. 1975); *Bastida v. Henderson*, 487 F.2d 860, 864 (5th Cir. 1973). *See also United States v. Harris*, 403 U.S. 573, 579 n.*, 91 S.Ct. 2075, 2080 n.*, 29 L.Ed.2d 723 (1971) (plurality opinion). "[W]here the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less important." *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir. 1972).

 Staleness has a unique pertinence to the applications for extensions of the original January 29 order. The purpose of the original application was to convince Chief Judge Parsons that electronic surveillance would produce evidence of criminal activity. However, once surveillance commenced, the best indicator of whether probable cause continued was the fruits of the actual surveillance conducted, rather than the informants' predictions of what future surveillance might uncover. Thus, as time went by, the informants' information became relatively more stale, and the results thus far obtained relatively more important. *See United States v. Bynum*, 360 F.Supp. 400, 404 (S.D.N.Y.), *aff'd*, 485 F.2d 490 (2d Cir. 1973). However, it is again important to note that this inquiry is critically dependent on context. As with any staleness inquiry, the passage of time is less important where the criminal activity alleged is of a protracted nature. The amount of progress that must be made in a given thirty day period in order to justify an extension will depend on the nature of the crime involved.

 Once it is established that the informant's conclusions rest on personal knowledge or information that is both reliable and timely, the focus of inquiry shifts to the second prong of the *Aguilar/Spinelli* test. The affidavit must be examined to see if it contains sufficient underlying circumstances so that the magistrate is justified in relying on the veracity of the informant. As Professor LaFave has explained, "under the second prong of *Aguilar*, properly characterized the 'veracity' prong, facts must be brought before the judicial officer so that he may determine *either* the inherent credibility of the informant *or* the reliability of his information on this particular occasion." 1 W. LaFave, *supra* p. 13 § 3.3(a) at 502 (footnote omitted) (emphasis in original).

 The focus of the veracity inquiry is whether there is a substantial basis for considering the informant credible. *See United States v. Harris*, 403 U.S. 573, 580–81, 91 S.Ct. 2075, 2080–81, 29 L.Ed.2d 723 (1971) (plurality opinion). Some kinds of information are inherently credible, such as eyewitness accounts of disinterested citizens acting as witnesses. *See id.* at 599, 91 S.Ct. at 2089 (Harlan, J., dissenting); *cf. Jaben v. United States*, 381 U.S. 214, 224, 85 S.Ct. 1365, 1370, 14 L.Ed.2d 345 (1965) ("[U]nlike narcotics informants, for example, whose credibility may often be suspect, the sources in this tax evasion case are much less likely to produce false or untrustworthy information."). *See generally United States v. Wilson*, 479 F.2d 936, 940 (7th Cir. 1973) (en banc). Information provided by confidential informants who are themselves members of the underworld, such as is claimed by the FBI with respect to its informants in this case, lack this inherent reliability. However, there are a variety of ways in which their credibility can be established. For example, additional evidence which corroborates the informant's allegations in important respects can be used. *See Harris*, 403 U.S. at 581, 91 S.Ct. at 2080; *Spinelli*, 393 U.S. at 415–17, 89 S.Ct. at 588–89; *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960); *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *In re DeMonte*, 674 F.2d 1169 at 1173 (7th Cir. March 24, 1982).[12] The fact that the informant has

---

12. The classic example of how an informant's tip can be corroborated is *Draper v. United*

*States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d

made a statement against his penal interest enhances credibility. *See Harris*, 403 U.S. at 583–85, 91 S.Ct. at 2081–82; *United States v. Davis*, 617 F.2d 677, 693 (D.C.Cir. 1979); *United States v. Hyde*, 574 F.2d 865, 863 (5th Cir. 1978); *United States v. DeCesaro*, 502 F.2d 604, 608–09 (7th Cir. 1974); *United States v. Damitz*, 495 F.2d 50, 55 (9th Cir. 1974); *United States v. Carmichael*, 489 F.2d 983, 986 (7th Cir. 1973) (en banc); *United States v. Fina*, 405 F.Supp. 267, 271–72 (E.D.Pa.1975); *United States v. Leta*, 332 F.Supp. 1357, 1362 (M.D.Pa. 1971).[13] A past record of providing reliable information is an indicia of reliability. *See United States v. Vazquez*, 605 F.2d 1269, 1281 (2d Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979); *United States v. Vento*, 533 F.2d 838, 844 (3d Cir. 1976); *United States v. McHale*, 495 F.2d 15, 17–18 (7th Cir. 1974); *United States v. Mainello*, 345 F.Supp. 863, 869–70 (E.D.N.Y. 1972); *United States v. Becker*, 334 F.Supp. 546, 548 (S.D.N.Y.1971). In cases such as this where there is more than one informant, the informants can corroborate each other. By telling consistent yet independent stories, the informants provide "cross-corroboration," and enhance the reliability of the application as a whole. *See In re*

*DeMonte*, 674 F.2d 1169 at 1173 (7th Cir. 1982); *United States v. Vazquez*, 605 F.2d 1269, 1281 (2d Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979); *United States v. Clements*, 588 F.2d 1030, 1034–35 (5th Cir. 1979), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 243 *and* 441 U.S. 936, 99 S.Ct. 2062, 60 L.Ed.2d 666 (1980); *United States v. Weinrich*, 586 F.2d 481, 488–90 (5th Cir. 1978); *United States v. Hyde*, 574 F.2d 856, 863–64 (5th Cir. 1978); *United States v. Askins*, 351 F.Supp. 408, 414 (D.Md.1972); *United States v. Becker*, 334 F.Supp. 546, 549–50 (S.D.N.Y. 1971). Telephone toll records may enhance reliability, by corroborating information that alleged co-conspirators talk to each other on the phone. *See United States v. Webster*, 639 F.2d 174, 178 (4th Cir. 1981); *United States v. Weinrich*, 586 F.2d 481, 490 (5th Cir. 1978); *United States v. Hyde*, 574 F.2d 856, 863 (5th Cir. 1978); *United States v. Best*, 363 F.Supp. 11, 18–19 (S.D.Ga. 1973).[14] Finally, the specificity of the information provided can in itself be an indicia of reliability. *See United States v. Unger*, 469 F.2d 1283, 1286–87 (7th Cir. 1972); *United States v. Roman*, 451 F.2d 579, 581 (4th Cir. 1971); *see generally Harris*, 403 U.S. at 579–80, 91 S.Ct. at 2079–80.[15]

327 (1959). In *Draper*, a federal narcotics agent received a tip that Draper was selling narcotics in Denver, had gone to Chicago, and would return to Denver on September 8 or 9 by train, carrying three ounces of heroin. The informant also described Draper and the clothes he would be wearing, and that Draper would be carrying a tan zipper bag. The agent went to the Denver train station on September 9, and saw a person matching Draper's description get off an incoming Chicago train carrying a tan zipper bag and wearing the clothing the informant had described. The Court held that once the agent had arrived at the train station and corroborated the informant's story in important respects, he had probable cause to arrest Draper. *Draper* also demonstrates that unlike the first prong, the second prong of the probable cause inquiry can be satisfied by evidence of innocent activity. The agent's observations supplied no evidence of criminal activity in themselves, but by corroborating aspects of the informant's story, they gave the whole of the story, including the allegations of criminal activity, an aura of credibility.

13. However, declarations against penal interest should be viewed cautiously. The information

should be carefully scrutinized to determine whether it is a true declaration against interest, or merely a self-serving statement by a paid informant with no real expectation that he might be prosecuted. *See Stanley v. State*, 19 Md.App. 507, 313 A.2d 847 (1974); 1 W. La-Fave, *supra* p. 13 § 3.3(c).

14. Telephone toll records are another example of how information innocent in itself can provide corroboration under the second *Aguilar/Spinelli* prong. *See also* note 12 supra.

15. Defendants interpret the second prong to prohibit mere conclusory statements of reliability. However, labeling a statement as "conclusory" is of little analytical aid. Affidavits containing conclusory allegations of reliability have been upheld so long as the affidavit contains allegations that, if true (and the truth of the allegations is assumed for purposes of the *Aguilar/Spinelli* inquiry), provide a basis for concluding that the informant is reliable. *See Jones v. United States*, 362 U.S. 257, 267 n.2, 80 S.Ct. 725, 734, n.2, 4 L.Ed.2d 697 (1960); *United States v. Carmichael*, 489 F.2d 983 (7th Cir. 1973) (en banc); *United States v. Hood*, 422

■■■■■■■■

**365**

## B

In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that, under certain circumstances, the fourth amendment requires that defendants be permitted to go behind the face of an application for a search warrant and challenge the truthfulness of the allegations it contains.

> [W]e hold that, where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

438 U.S. at 155–56, 98 S.Ct. at 2676–77.

■■■■ Thus, there are three elements to a *Franks* claim, (i) a false statement, (ii) which is made by the affiant with knowledge of the falsity, or with reckless disregard for the truth, (iii) that is material, meaning that without the false statement the affidavit would not have been sufficient to establish probable cause.[16]

■■■■ Defendants claim that the applications in the instant case violate *Franks*.[17] However, *Franks* indicates that defendants must do more than merely allege material misrepresentations in order to obtain an evidentiary hearing on their allegations.

To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

438 U.S. at 171, 98 S.Ct. at 2684.

*Franks* requires that defendants make a "substantial preliminary showing," 438 U.S. at 155, 98 S.Ct. at 2676, in order to demonstrate the need for a hearing. Absent such a showing, a hearing is not warranted.

■■■■ *Franks* also limits the kind of falsity which may be the subject of a challenge. While *Franks* requires that the warrant affidavit be "truthful,"

> [t]his does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or is appropriately accepted by the affiant as true.

438 U.S. at 165, 98 S.Ct. at 2681. *Franks* only permits challenges to intentional or

F.2d 737, 739 (7th Cir. 1970). *See also Harris*, 403 U.S. at 580–81, 91 S.Ct. at 2080–81. The teaching of these cases is that "conclusory" statements are permissible as long as the affiant states some reason for his conclusion that the informant is reliable.

**16.** Prior to *Franks*, the law in this circuit permitted challenges to any intentional misrepresentation, irrespective of its materiality. *See United States v. Carmichael*, 489 F.2d 983, 988 (7th Cir. 1973) (en banc).

**17.** The government concedes that *Franks* is applicable to warrants obtained under Title III.

reckless misrepresentations of the affiant himself. *Id.* at 163–64, 171, 98 S.Ct. at 2680–81, 2684; *see also Rugendorf v. United States,* 376 U.S. 528, 532–33, 84 S.Ct. 825, 827–28, 11 L.Ed.2d 887 (1964). The fact that a third party lied to the affiant, who in turn included the lies in a warrant affidavit, does not constitute a *Franks* violation. A *Franks* violation occurs only if the affiant knew the third party was lying, or if the affiant proceeded in reckless disregard of the truth. Therefore, allegations that hearsay contained in a warrant application is false, or that an informant whose story was recited by an affiant was lying, are insufficient to require a *Franks* hearing, since the falsity or recklessness alleged is not that of the affiant, but of a third party. *See United States v. Skramstad,* 649 F.2d 1259, 1265 (8th Cir. 1981); *United States v. Schauble,* 647 F.2d 113, 117 (10th Cir. 1981); *United States v. Smith,* 635 F.2d 1329, 1334 (8th Cir. 1980); *United States v. Arrington,* 618 F.2d 1119, 1125 (5th Cir. 1980), *cert. denied,* 449 U.S. 1086, 101 S.Ct. 876, 66 L.Ed.2d 812 (1981); *United States v. Luschen,* 614 F.2d 1164, 1172–73 (8th Cir.), *cert. denied,* 446 U.S. 939, 100 S.Ct. 2161, 64 L.Ed.2d 793 (1980); *United States v. Barnes,* 604 F.2d 121, 152–53 (2d Cir. 1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *United States v. Brian,* 507 F.Supp. 761, 764 (D.R.I.1981); *United States v. Weingartner,* 485 F.Supp. 1167, 1182–83 (D.N.J.1979), *appeal dismissed,* 642 F.2d 445 (3d Cir. 1981); *United States v. DePalma,* 461 F.Supp. 800, 814–15 (S.D.N.Y. 1978); *Schneider v. State,* 269 Ark. 245, 599 S.W.2d 730 (1980), *cert. denied,* 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981);

*Misenheimer v. State,* 268 Ind. 274, 279–80, 374 N.E.2d 523, 527–28 (1978); *State v. Hermerding,* 5 Kan.App. 797, 626 P.2d 210 (1981); *State v. Babbit,* 363 So.2d 690 (La. 1978); *State v. White,* 391 A.2d 291 (Me. 1978); *State v. Stickelman,* 207 Neb. 429, 299 N.W.2d 520 (1980); *Taylor v. State,* 604 S.W.2d 175 (Tex.Crim.App.1980); *State v. Larsen,* 26 Wash.App. 564, 613 P.2d 542 (1980); 2 W. LaFave, *supra* p. 13 § 4.4(b). *See also United States v. Anderson,* 542 F.2d 428, 432–33 (7th Cir. 1976); *United States v. Carmichael,* 489 F.2d 983, 989 (7th Cir. 1973) (en banc); *United States v. Sultan,* 463 F.2d 1066, 1070 (2d Cir. 1972); *United States v. Kemp,* 421 F.Supp. 563, 569–70 (W.D.Pa.1976); *Theodor v. Superior Court,* 8 Cal.3d 77, 501 P.2d 234, 104 Cal. Rptr. 226 (1972); *State v. Baca,* 84 N.M. 513, 505 P.2d 856 (1973).[18]

■ Furthermore, even when there is an allegation that the affiant knew the informant was lying, was reckless in reporting the story, or deliberately or recklessly misreported the informant's story to the court, the allegation must be accompanied by the required offer of proof. For example, a claim that the informant did not exist, or did not report the information attributed to him in the warrant affidavit, if unsupported by substantial corroborating evidence, does not entitle a defendant to a *Franks* hearing. *See, e.g., People v. Coleman,* 91 Ill.App.3d 646, 651, 47 Ill.Dec. 548, 551, 415 N.E.2d 553, 557 (1980); *People v. Poindexter,* 90 Mich.App. 599, 282 N.W.2d 411 (1979); *State v. Cervantes,* 92 N.M. 643, 593 P.2d 478 (Ct.App.), *cert. denied,* 92 N.M. 621, 593 P.2d 62 (1979).[19]

18. There is one exception to this principle: where hearsay is provided to one government agent who knows the informant is lying, recklessly believes the informant, or deliberately or recklessly misreports the information to a second government agent, who then innocently includes the misrepresentations in an affidavit. In such a case, the government can "not insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity." *United States v. DePalma,* 461 F.Supp. 800, 815 n. 13 (S.D.N. Y.1978). *See* 438 U.S. at 163 n. 6, 98 S.Ct. at 2680 n. 6.

19. *Franks* reserved the question whether special circumstances might exist which would necessitate the disclosure of the identity of a confidential informant. *See* 438 U.S. at 170, 98 S.Ct. at 2684. Since defendants do not seek disclosure here, we need not reach this question. However, defendants have requested that the court conduct an in camera, ex parte review of the government's contact reports summarizing the information received from its informants, so that the court can review defendants' claims that the informants either do not exist, or did not provide the information attributed to them. The government concedes the

*Franks* addresses explicitly only the problem of misrepresentations contained in the four corners of the warrant affidavit. However, defendants contend that *Franks* also applies to omissions of material information from an affidavit. It does seem to be the case that the considerations underlying *Franks* apply with equal force to intentional or reckless material omissions. In *Franks*, the Court noted that the fourth amendment's protections would be seriously undermined if materially false warrant affidavits could go unchallenged.

> Because it is the magistrate who must determine independently whether there is probable cause, it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment.

438 U.S. at 165, 98 S.Ct. at 2681 (citations omitted). Consequently, the Court concluded that unless challenges to the veracity of warrant affidavits were permitted, the warrant clause of the fourth amendment "would be reduced to a nullity [once] a police officer was able to use deliberately falsified allegations to demonstrate probable cause, and, having misled the magistrate, then was able to remain confident that the ploy was worthwhile." 438 U.S. at 168, 98 S.Ct. at 2682.

 If the government could intentionally or recklessly omit material facts from warrant affidavits and applications, the same danger would be created. If the

government had unfettered power to pick and choose which facts to present to the magistrate regardless of how misleading the presentations were, the magistrate's review of the affidavit would be rendered meaningless. The magistrate would not be provided with a fair opportunity to review the government's evidence in making the probable cause determination. He would perform his crucial role at the whim, caprice or duplicity of the governmental agents involved in the case. Such a result cannot be squared with *Franks'* demand that the government not frustrate the magistrate's review of probable cause by deliberately or recklessly providing misleading information. Under the rationale of *Franks*, defendants must be permitted to challenge an affidavit on the basis of the intentional or reckless omission of material facts from the affidavit. *United States v. Willis*, 647 F.2d 54, 58 (9th Cir. 1981); *United States v. House*, 604 F.2d 1135, 1141 & n. 9 (8th Cir. 1979), *cert. denied*, 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980); *United States v. Lace*, 502 F.Supp. 1021, 1045–56 (D.Vt.1980); *United States v. Lewis*, 425 F.Supp. 1166, 1173 (D.Conn.1977); *Schmid v. State*, 615 P.2d 565 (Alaska 1980); *People v. Kurland*, 28 Cal.3d 376, 618 P.2d 213, 168 Cal.Rptr. 667 (1980), *cert. denied*, 451 U.S. 987, 101 S.Ct. 2321, 68 L.Ed.2d 844 (1981); *People v. Townsend*, 90 Ill.App.3d 1089, 1096, 46 Ill.Dec. 599, 604–05, 414 N.E.2d 483, 488–89 (1980); *see United States v. Dennis*, 625 F.2d 782, 791–92 (8th Cir. 1980); *United*

---

court has the authority to do this, but suggests defendants have made no showing justifying the exercise of our discretion. We have declined to order the government to produce the reports for the court, for a number of reasons.

First, we doubt the value of an ex parte in camera review, since the government's presentation could not be tested by cross-examination. *See United States v. Moore*, 522 F.2d 1068, 1073 (9th Cir. 1975), *cert. denied*, 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976); *United States v. Marihart*, 492 F.2d 897, 901 n. 6 (8th Cir.), *cert. denied*, 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974). Second, the *Aguilar/Spinelli* tests provide safeguards as to the reliability of the informant's stories. *See United States v. House*, 604 F.2d 1135, 1140–41 (8th Cir. 1979), *cert. denied*, 445 U.S. 931, 100 S.Ct.

1320, 63 L.Ed.2d 764 (1980). Finally, while we recognize that without some disclosure, a *Franks* claim regarding confidential informants may be difficult if not impossible to prove, *see United States v. Brian*, 507 F.Supp. 761, 766–67 (D.R.I.1981), this should not mean that disclosure should be routine, in light of the "presumption of validity with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S. at 171, 98 S.Ct. at 2684. Some preliminary showing overcoming the presumption should be required. For example, in *Brian*, defendants introduced the statement of an FBI agent involved in the case indicating that the informants in question did not in fact exist. Here, defendants' arguments are largely speculative and unsupported by anything more than defendants' own affidavits.

*States v. Martin*, 615 F.2d 318, 328–29 (5th Cir. 1980); *United States v. Vazquez*, 605 F.2d 1269, 1282 (2d Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408, 444 U.S. 1019, 100 S.Ct. 674, 62 L.Ed.2d 649 (1979); *United States v. Melvin*, 596 F.2d 492, 498–500 (1st Cir.), *cert. denied*, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979); *United States v. Collins*, 549 F.2d 557, 561 (8th Cir.), *cert. denied*, 431 U.S. 940, 97 S.Ct. 2656, 53 L.Ed.2d 259 (1977); *United States v. Park*, 531 F.2d 754, 758–59 (5th Cir. 1976); *United States v. Burke*, 490 F.Supp. 855, 857 n. 1 (S.D.Fla.1980); *United States v. Balsamo*, 468 F.Supp. 1363, 1390 (D.Me. 1979); *United States v. Acon*, 403 F.Supp. 1189, 1193–94 (W.D.Pa.1975); *Morris v. Superior Court*, 57 Cal.App.3d 521, 129 Cal. Rptr. 238 (1976); *see also United States v. Lefkowitz*, 618 F.2d 1313, 1317 n. 3 (9th Cir.), *cert. denied*, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 27 (1980); *United States v. Davis*, 617 F.2d 677, 693–95 (D.C.Cir.1979). However, when defendants challenge the warrant on the basis of information not brought to the attention of the authorizing judge which they claim tends to negate the existence of probable cause, the government is entitled to respond by presenting its own evidence, also not brought to the attention of the magistrate, which supports the existence of probable cause. *See United States v. Carmichael*, 489 F.2d 983, 990 (7th Cir. 1973) (en banc); *State v. Post*, 286 N.W.2d 195, 201–02 (Iowa 1979); 2 W. La-Fave, *supra* p. 13 § 4.4 at 18 (Supp.1982).[20]

Some of the claims defendants make in this case are based on their theory that, had the government conducted a reasonably ad-equate investigation prior to seeking authority to conduct electronic surveillance, it would have discovered that the assertions made in the affidavits were false. Before the individual assertions are considered, some remarks about whether *Franks* encompasses a "duty to investigate" are in order.

Defendants' "duty to investigate" claims, by their very nature, involve reckless and not intentional misstatements. Defendants do not argue that the government actually knew the affidavits were materially false, but that, had it investigated, it would have discovered their falsity, and that the failure to do so was made with reckless disregard of the truth. Unfortunately, *Franks* provides little guidance as to what constitutes "reckless disregard for the truth." A useful analogy, however, is provided by the principle of first amendment law that liability for a defamatory statement regarding a public figure cannot be imposed unless the plaintiff proves that the defendant acted with reckless disregard for the truth. *See generally Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). The Court has written that

> reckless conduct is not measured by whether a reasonably prudent man would have published, *or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.* Publishing with such doubts shows reckless disregard for the truth.

<hr/>

**20.** Even though it is theoretically possible to make out a *Franks* claim on the basis of material omissions, in practice it will be very difficult for a defendant to make the necessary showing that the omissions were intentional or reckless. As Judge Goldberg has perceptively noted,

> [H]ere, there is no evidence in the record directly illuminating the state of mind of the affiant, Agent Kinzer, when he omitted [material facts] from the affidavit . . ., for Martin proved little more than that these omissions were made. Doubtless it will often be difficult for an accused to prove that an omission was made intentionally or with reckless dis-

regard rather than negligently unless he somehow gained independent evidence that the affiant had acted from bad motive or recklessly in conducting his investigation and making the affidavit. Nevertheless, it follows from *Franks* that the accused bears the burden of showing by a preponderance of the evidence that the omission was more than a negligent act. It is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from the omission itself.

*United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980).

*St. Amant v. Thompson*, 390 U.S. 727, 731–32, 88 S.Ct. 1323, 1325–26, 20 L.Ed.2d 262 (1968) (emphasis supplied). The actual presence of serious doubts as to the truth of the representations published is the key to a finding of reckless disregard for the truth. "Failure to investigate does not in itself establish bad faith." *Id.* at 733, 88 S.Ct. at 1326. *See Herbert v. Lando*, 441 U.S. 153, 156–57, 99 S.Ct. 1635, 1638–39, 60 L.Ed.2d 115 (1979); *Gertz*, 418 U.S. at 335 n. 6, 94 S.Ct. at 3005 n.6; *Sullivan*, 376 U.S. at 287–88, 84 S.Ct. at 729–30.

The same considerations of requiring actual bad faith, rather than merely a breach of duty, which underlie this principle of first amendment law also underlie *Franks*. *See* 438 U.S. at 168–70, 98 S.Ct. at 2682–84, *see also United States v. Carmichael*, 489 F.2d 983, 988–89 (7th Cir. 1973) (en banc). As a result, this branch of first amendment law provides useful guidance, and indicates that the reckless disregard for truth required by *Franks* is not established by a mere failure to investigate. Rather, it can only be demonstrated if defendants can establish that the government in fact entertained serious doubts as to the truth of the affidavits or had obvious reasons to doubt the accuracy of the information contained therein. *United States v. Davis*, 617 F.2d 677, 694 (D.C.Cir.1979); *see United States v. Edwards*, 602 F.2d 458, 465 (1st Cir. 1979). Therefore, failure to investigate, in itself, does not state a claim under *Franks*. *See Edwards*, 602 F.2d at 465; *United States v. Young Buffalo*, 591 F.2d 506, 510 (9th Cir.), *cert. denied*, 441 U.S. 950, 99 S.Ct. 2178, 60 L.Ed.2d 1055 (1979); *United States v. Santarpio*, 560 F.2d 448, 453 n. 4 (1st Cir. 1977), *cert. denied*, 434 U.S. 984, 98 S.Ct. 609, 54 L.Ed.2d 478 (1978); *United States v. Weingartner*, 485 F.Supp. 1167, 1183 (D.N.J. 1979), *appeal dismissed*, 642 F.2d 445 (3d Cir. 1981); *United States v. Acon*, 403 F.Supp. 1189, 1193–94 (W.D.Pa.1975); *Caslin v. Commonwealth*, 491 S.W.2d 832, 834 (Ky.1973).[21] Moreover, when examining the evidence of reckless error proffered by defendants, it is important to conduct the inquiry with an appreciation of the difficulty of the task confronting the government agents. *Franks* itself notes that mistakes are inevitable when agents must, of necessity, rely on hearsay or make hasty judgments in the midst of an ongoing and quickly-developing investigation. *See* 438 U.S. at 165, 169, 98 S.Ct. at 2681, 2683. The evidence obtained during investigations is rarely clear-cut; "smoking guns" are rarities. More often, the evidence obtained and presented to the magistrate will contain ambiguities and confusing references, especially when the results of wiretaps are presented. In such cases, mistakes are to be expected, and are not necessarily indicative of recklessness. *See United States v. Young Buffalo*, 591 F.2d 506, 511 (9th Cir.), *cert. denied*, 441 U.S. 950, 99 S.Ct. 2178, 60 L.Ed.2d 1055 (1979); *United States v. Marcello*, 508 F.Supp. 586, 604–06 (E.D.La.1981).

---

21. There are also ample practical reasons why a duty to investigate should not be imposed, at least in cases involving complex investigations such as the instant one. For one thing, requiring the Government to investigate all informant data may compromise the overall investigation by bringing its existence to the attention of the target. *United States v. Loften*, 518 F.Supp. 839, 844 (S.D.N.Y.1981). For another, the *Aguilar/Spinelli* test provides significant safeguards ensuring the reliability of the hearsay contained in the affidavit. Other factors were enumerated by the Court in *United States v. Kahn*, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974).

> A requirement that the Government fully investigate the possibility that any likely user of a telephone was engaging in criminal activities before applying for an interception order would greatly subvert the effectiveness of the law enforcement mechanism that Congress constructed.... If the telephone were in a store or an office, the Government might well be required to investigate everyone who had access to it—in some cases, literally hundreds of people—even though there was no reason to suspect that any of them were violating any criminal law. It is thus open to considerable doubt that such a requirement would ultimately serve the interests of individual privacy.

*Id.* at 153, 94 S.Ct. at 983. The amorphous and wide-ranging nature of the allegations in the warrant affidavit, described in Part III, *infra*, would have required a similarly wide-ranging pre-application investigation, in violation of the dictates of *Kahn*.

With the preceding principles in mind, the warrant applications and affidavits in this case can be examined.

### III

On January 29, 1979, the government, through Emil A. Tonkovich, an attorney for the United States Department of Justice, applied for a Title III order to intercept telephone conversations of Allen Dorfman, Sol Schwartz, Abe Chapman, Anthony LaMonica, Samuel LaMonica, Carl Thomas and others yet unknown taking place over certain of Amalgamated's phone lines. Wading through the boilerplate, the substance of the application was that there was probable cause to believe that a group of persons were conspiring to establish, promote, manage, and/or receive compensation from hidden interests in one or more Reno and Las Vegas, Nevada gambling casinos. Such a conspiracy would have violated the Nevada Gaming Control Act, Nev.Rev.Stat. §§ 463.160, 463.170, 463.200, 463.520, 463.-530 and 463.360 (1977), and, depending upon the appropriate interstate nexus, 18 U.S.C. §§ 371, 1952, 1962(c)–(d) and 1963 (1976). The application named those persons whom there was probable cause to believe were engaged in the alleged unlawful activity, including Dorfman and, with respect to the Reno casinos, defendant Joseph Lombardo ("Lombardo"). The application alleged probable cause to believe that the named interceptees commonly used the particular Amalgamated telephone lines and that a tap would intercept conversations of the named interceptees regarding the criminal activities alleged in the application. The application was supported by the affidavit of Special Agent Peter J. Wacks ("Wacks") of the FBI.

### A

■ The Wacks affidavit does not allege that Wacks had personal knowledge of the illegal activities alleged in the affidavit. Rather, it relies on hearsay statements attributed to six confidential informants, one named informant, and certain telephone subscriber and toll record information.[22] This information must be tested against the standards of *Aguilar/Spinelli* outlined above.

■ Confidential Informant # 1 (CI # 1), as he is named in the Wacks affidavit, stated that Dorfman is controlled by organized crime figures in Chicago, that he handles business investments on behalf of organized crime interests, and arranges loans made to organized crime interests by the Fund. We take judicial notice of the fact that the term "organized crime" refers to an ongoing and highly structured organization engaging in criminal activity on a regular basis.[23]

We have always had forms of organized crime and corruption. But there has grown up in our society today highly organized, structured and formalized groups of criminal cartels, whose existence transcends the crime known yesterday, for which our criminal laws and procedures were primarily designed. The "American system was not designed with (organized crime) * * * in mind," the President's Crime Commission noted in its report "The Challenge of Crime in a Free Society" (1967), "and it has been notably unsuccessful to date in preventing such organizations from preying on society." These hard-core groups have become more than just loose associations of criminals. They have developed into corporations of corruption, indeed, quasi-governments in our society, presenting a unique challenge to the administration of justice. Organized crime has never limited itself to one illegal endeavor. Today, it is active in, and largely controls, pro-

---

**22.** The Wacks affidavit also included a summary of the results of the FBI's investigation of Dorfman. However, the summary merely indicates that the investigation had been unsuccessful, and hence does not add to the showing of probable cause the application purports to make.

**23.** The meaning of the term "organized crime" is a legislative fact which may properly be subject to judicial notice. *See* Advisory Committee Note, Fed.R.Evid. 201(a).

fessional gambling, which can only be described as exploitative, corruptive and parasitic, draining income away from food, clothing, shelter, health, and education in our urban ghettoes. The net take is estimated as $7 billion a year.

Sen.Rep.No.1097, 90th Cong., 2d Sess. 70 (1968), *reprinted* in [1968] U.S.Code Cong. & Admin.N. 2112, 2157 (1968) (asterisks in original) [hereinafter cited as Sen.Rep.No. 1097].

The Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes; (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens; and (5) organized crime continues to grow because of defects in the evidence-gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other sanctions or remedies to bear on the unlawful activities of those engaged in organized crime and because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact.

Pub.L.No.91–452, § 1, 84 Stat. 922–23 (1970). "The major purpose of title III is to combat organized crime." Sen.Rep.No. 1097, *supra* p. 31 at 70, 2157. *See* Pub.L.No. 90–351, tit. III § 801(c), 82 Stat. 211 (1968).

CI # 1 went on to detail Dorfman's link with organized crime, stating that through Amalgamated (which is in the business of insurance) Dorfman charges inflated insurance premiums to several large hotel-casinos in Las Vegas and splits the proceeds with organized crime figures and that Dorfman derives income through organized crime's hidden interest in Argent Corporation, which owns several Las Vegas hotel-casinos. Specifically, CI # 1 alleged that Dorfman had had a hidden interest in the Slots-Of-Fun and Bingo Palace casinos for a number of years, and that he frequently discusses these interests over his telephones at his Chicago office and home, and his west coast home at La Costa, California, with Carl Thomas, the operator of Slots-Of-Fun and Bingo Palace.

Another informant, CI # 3, also stated that Dorfman works for organized crime interests, and arranges Fund loans to those interests, and that Dorfman handles insurance for several casinos. CI # 3 alleged that Dorfman currently had a hidden interest in the Slots-A-Fun [24] casino and that money is skimmed from this casino and funneled through Dorfman to organized crime interests. CI # 3 stated that Dorfman discusses his illegal activities on his office and home telephones in Chicago.

A third informant, CI # 2, also alleged, but in conclusory fashion, that Dorfman had a hidden interest in Las Vegas casinos. He/she stated in greater detail that Dorfman, together with Abe Chapman, Joseph Sica, Anthony LaMonica and Samuel LaMonica, were attempting to obtain a hidden interest in the Horseshoe Club casino in Reno by buying it through a front man from its present owner, Dr. Tom Mullis ("Mullis"). CI # 2 explained that the group had had trouble obtaining financing, but was about to consummate the deal by obtaining a loan from a number of Chinese investors. The illegal activities are carried out, in part, over Dorfman's office and

---

**24.** Apparently, CI # 3 told Wacks to spell "Slots-A-Fun" differently than did CI # 1.

home telephones in Chicago, and involve the use of at least two intermediaries, named Millie Watson and Karen Jacobs.

■ The information provided by these informants satisfies the first *Aguilar/Spinelli* prong. The informants detailed specific criminal activity. Each informant states that he is personally acquainted with at least some of the alleged conspirators, and that his information is based on personal observation of, personal conversations with, and actual overhearing of the alleged conspirators. The specificity of the information provided, including how skimming is conducted, how Dorfman funnels casino money to organized crime, and how the Horseshoe purchase would be financed, also indicates that the information is based on something more than casual rumor. The information provided by CI's # 1 and # 3 had been updated during January, and the context indicates that CI # 2's information had been provided recently. Moreover, the informants detailed an ongoing scheme of long duration, so staleness was not a critical problem. On balance, there was a basis for concluding that the informants' conclusions were grounded in something more substantial than speculation or casual rumor. Under the standards set out above, Chief Judge Parsons was justified in concluding that the informant material was adequately grounded in underlying facts supporting the informants' conclusions. The informant data passes muster under the first prong of *Aguilar/Spinelli.*

■ The second prong of *Aguilar/Spinelli* is also satisfied. The informants' data cross-corroborates in important respects. The Wacks affidavit also states that the informants had proven reliable in the past, and that the FBI had consistently corroborated the information that had been provided in the past by these informants. The Wacks affidavit included telephone toll records and subscriber information which corroborated the informants' statements about the patterns of telephone calls which the alleged conspirators employed. The information was further corroborated by the statements of other confidential informants. James Fratianno and CI # 4 corroborated the allegations that Dorfman and Lombardo were involved in organized crime activities. CI # 5 and CI # 6 corroborated the allegations that Carl Thomas was controlled by organized crime interests. While this additional informant information was somewhat stale, it did tend to reinforce the reliability of the hearsay provided by CI # 1, # 2 and # 3.[25]

■ Chief Judge Parsons was justified in concluding that the allegations of criminal activity in the January 29 application were sufficiently supported to justify the issuance of a Title III order. There was probable cause on January 29.

## B

■ Defendants next assert that, assuming the sufficiency of the January 29 application and wiretap order, the allegations contained in the application as to Dorfman's suspected criminal activity were false. Of course, a subsequent discovery that the application allegations were erroneous does not invalidate the January 29 order. "If the officer acts with probable cause, he is protected even though it turns out that the citizen is innocent." *Henry v. United States,* 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959). However, the alleged falsity of the allegations is the basis of defendants' *Franks* claim regarding the January 29 application. Defendants claim that the government either knew the allegations were false, or proceeded in reckless disregard for the truth.

■ The core of defendants' offer of proof on this *Franks* claim is that Dorfman had no hidden interest in Bingo Palace and Slots-A-Fun, and sought no hidden interest in Horseshoe. *See* 1 App. III, Affidavit of

---

25. We do not hold that allegations that Dorfman and/or Lombardo are linked to organized crime are sufficient in themselves to create probable cause. We merely rely on those allegations as lending background, and hence reliability, to the allegations of specific casino-related unlawful activity contained in the January 29 application.

Allen M. Dorfman, Affidavit of John C. Tucker, Affidavit of Sol Schwartz, Affidavit of Dr. Tom N. Mullis. However, these materials in no way indicate that anyone in the government, much less the affiant, Wacks, knew the allegations were false, or proceeded in reckless disregard for the truth. At best, defendants' offer of proof indicates that the informants were lying. However, this is insufficient to raise a *Franks* claim. Under the standards set forth in Part II–B, p. 20–22 *supra*, a showing that informant data contained in an affidavit is false does not raise a claim under *Franks*.

 Defendants make two arguments that Wacks knew the January 29 affidavit was false, or was made with reckless disregard for the truth. First, they argue that the government should have, but did not investigate the ownership of the casinos in question prior to seeking Title III authorization. Defendants argue that there were a number of individuals the government could have interviewed to determine if Dorfman in fact had or sought hidden interests in Nevada casinos prior to seeking the wiretap. However, as we noted above, *Franks* encompasses no duty to investigate. Absent a showing that the government had actual knowledge that an investigation would prove Dorfman's innocence, or had obvious reasons to believe that was the case, no *Franks* claim is stated. Here, there is no showing that the government knew that an investigation would clear Dorfman. Indeed, it is logical to assume that had the government interviewed Dorfman's alleged co-conspirators, it would not have believed their answers: if these persons were engaged in an illegal conspiracy, they hardly would have told the FBI about it. Moreover, there is no reason to believe that anyone but Dorfman and his co-conspirators would know about the scheme. The point of a hidden interest is that it is "hidden." Dorfman hardly would have let it be known that he was seeking a "hidden" interest. The informants indi-

cated that Dorfman was acting through a "front." Those involved in the casinos would not have known of Dorfman's interest precisely because it was "hidden" by a "front."

 Second, defendants rely on the affidavit of Mullis, which they claim proves the government knew the January 29 application was false. However, while Mullis' statement does indicate that he was interviewed by the FBI in late 1978, *see* 1 App. III, Affidavit of Dr. Tom N. Mullis, and the government concedes he was reinterviewed on January 18, 1979, *see* Government's Consolidated Response to Defendants' Motions to Suppress Electronic Surveillance at 73–74, the Mullis affidavit does not indicate that Mullis told the FBI anything about Dorfman at all, much less that Dorfman was innocent. *See* 1 App. III, Affidavit of Dr. Tom N. Mullis ¶¶ 16–17. In any event, what Mullis told the FBI hardly clears Dorfman. Had Mullis known that he was about to enter an unlawful transaction for the sale of the Horseshoe, he surely would not have told the FBI about it. Moreover, it is more likely that he would not know, since, according to CI # 2 Dorfman was acting through a front, so that Mullis would not have known the real identity of those seeking to buy the Horseshoe from him. In fact, the Mullis affidavit corroborates CI # 2 in an important respect, since Mullis states that he was in fact attempting to sell the Horseshoe during the period in which CI # 2 said Dorfman was trying to buy it. Finally, defendants have made no showing that the results of the Mullis interview were communicated to Wacks. The test under *Franks* is not the state of mind of "the government," but the state of mind of the affiant, here Wacks. There is no showing that Wacks knew of the Mullis interviews, and in the absence of such a showing, the offer of proof fails to implicate the state of mind of the affiant. Defendants' offer of proof therefore falls short, and defendants were not entitled to a *Franks* hearing on the January 29 application.[26]

---

26. During the *Franks* hearing on the March 1 and 30 applications, defendants produced as an

offer of proof an affidavit from Anthony LaMonica. Defendants have no satisfactory expla-

Accordingly, prior to the evidentiary hearing which commenced March 29, 1982, we ruled that defendants were not entitled to a *Franks* hearing regarding the January 29 application. See T. March 22, 1982.

## IV

On March 1, 1979, Tonkovich made another application to Chief Judge Parsons for an order authorizing electronic surveillance under Title III. The application sought and the court granted authority to continue the tap at Amalgamated, and to intercept the conversations of Dorfman, Lombardo, defendant Thomas O'Malley, Sol Schwartz, Abe Chapman, Anthony LaMonica, Samuel LaMonica, Carl Thomas, William Webbe, Mildred Watson, David Dorfman (Allen Dorfman's son), Sandy LNU (last name unknown), Robert Bjornsen, Allen Glick and others yet unknown.[27] The application was supported by an affidavit executed by Wacks and transcripts of telephone conversations that had been intercepted pursuant to the January 29 surveillance order.

### A

The Bingo Palace, Slots-A-Fun and Horseshoe hidden interest allegations were repeated in the March 1 application. They were supported by essentially the same informant hearsay as had been contained in the January 29 application, except that the Wacks affidavit stated the CI # 1 and CI # 3 had been re-interviewed in the second week of February, and had updated their information. CI # 2 had been recontacted on February 8.

Defendants rely heavily on the fact that the application contains no allegations that calls pertinent to the January 29 offenses involving the three casinos had been intercepted. This, they argue, belied the informants' claims that the alleged conspirators were in frequent telephonic communication regarding their alleged criminal activity. The government responds by arguing that the failure to obtain interceptions pertinent to the January 29 allegations was explained by the fact that Dorfman was out of town for much of February, and that the surveillance did not include all telephone lines of Amalgamated or Dorfman's home phone, on which the sorts of conversations described by the informants may have taken place during February. However, these government explanations were not presented to Chief Judge Parsons in the March 1 application. The statute requires, in § 2518(1)(f), that extension applications contain a statement of results obtained to date, or an explanation of the failure to obtain results. The government's application did not contain the required explanation.

The omission was critical. The purpose of the warrant requirement is to make law enforcement officials submit their conclusions to a neutral and detached magistrate, so that the protections of the fourth amendment are secured by, and the decision that circumstances justify issuance of a warrant is made by the magistrate, instead of being left to the discretion of the officers. See pp. 358–361 *supra.* Here, Chief Judge Parsons was deprived of the opportunity to judge the adequacy of the government's explanation, and whether the failure to obtain interceptions pertinent to the January 29 allegations rendered those

nation for the tardiness of this offer. Mr. LaMonica claims that CI # 2 was lying. Affidavit of Anthony LaMonica ¶ 9. Assuming that is the case, no *Franks* showing is made since Wacks and not CI # 2 was the affiant. Mr. LaMonica also states that he was interviewed by the FBI and that he said nothing implicating Dorfman in a casino scheme. *Id.* ¶¶ 7, 12. For the same reasons that the Mullis affidavit is unpersuasive, the LaMonica affidavit fails to make out a *Franks* claim.

27. Defendants Roy L. Williams and Amos Massa are not named in the March 1 order as persons whose conversations may be intercepted under the order. Thus, since the order does not authorize seizure of their conversations, these defendants may not challenge the order. By the same token, the order does not justify any interceptions that did occur in March of these defendants' conversations. The propriety of interceptions not explicitly authorized by the surveillance orders in this case is considered in Part VII–B *infra.*

allegations stale. Without either including interceptions corroborating the informants' allegations that pertinent conversations would be frequently intercepted, or explaining the failure to corroborate the allegations, there was both a statutory violation and no probable cause to authorize further surveillance based on the January 29 allegations.

■ However, the failure of the government to justify continued interception on March 1 based on the Bingo Palace, Slots-A-Fun and Horseshoe allegations does not vitiate the March 1 order entered by Chief Judge Parsons, because those were not the only allegations in the application. In his affidavit, Wacks also alleged that the FBI had intercepted conversations pursuant to the January 29 wiretap order which "concern the promotion and management of hidden and unlawful financial interests in the Aladdin hotel-casino and possibly other casinos located in Las Vegas, Nevada." 1 App. I, Application of March 1, 1979; Ex. B at 53. The application went on to include transcripts of the conversations. In his introduction to the transcripts, Wacks provided Chief Judge Parsons with biographical material on the participants in the conversations, and explained the meaning of certain veiled references in the conversations. *Id.* at 53–53C.[28]

The transcripts, together with the gloss placed on them by Wacks, reveal the following. Two conversations intercepted by the FBI specifically dealt with an Aladdin transaction. On January 30, a conversation between David Dorfman and Sandy LNU was intercepted in which they discuss an attempt to refinance the Aladdin and Landmark casinos which was then being made by the Colonial Commercial Credit Corporation. Another conversation with the same participants was intercepted on February 1, in which Sandy stated that Allen Dorfman had informed Sandy that the Aladdin deal

was "dead." The two conversations, taken together, indicate that Allen Dorfman had been contacted by Sandy about the deal, was concerned about it and was going to have a meeting at some point in the future regarding the deal. *See id.* at 56–57E.

On January 30, a conversation involving Allen Dorfman, Lombardo, Amos Massa ("Massa") and William Webbe ("Webbe") was intercepted, in which they discuss, in veiled terms, their efforts to gain defendant Roy L. Williams' ("Williams") approval of their plan to have Massa and defendant Thomas O'Malley ("O'Malley") speak with an unnamed person about a "bid" which the conversants wanted "handled." *See id.* at 54–54H. On the next day, Webbe was intercepted speaking to one Robert Bjornsen ("Bjornsen"). The conversation indicated that Bjornsen had made an offer of some sort to Julian Burke, who was identified by Wacks as an employee of Victor Palmieri and Company, the manager of Fund real estate holdings west of the Mississippi River. *See id.* at 53B–53C. The transcript reveals that Dorfman had worked hard to get a bidder competing against Bjornsen to withdraw. Reference is also made to telling "the Senator" about the situation. *See id.* at 55–55E. A conversation intercepted on February 2 between Webbe and Lombardo also made reference to a bid on unidentified property and Dorfman's efforts to get a group to "back off." *See id.* at 58–58M. A series of four transcripts of calls intercepted on February 13 indicate that a bid had been rejected by "Palmieri," that the original bidder who had withdrawn was Allen Glick, the president of Argent Corporation which owns several Las Vegas hotel-casinos, that a new bid had been made by one Glussman, who was a concessionnaire of Argent's, and reference was made to the reactions of Massa, O'Malley and Williams to these developments. *See id.* at 59–62H.

28. For example, Wacks explained that references in the transcripts to "Tom" or "the Irishman" refer to defendant Thomas O'Malley. For purposes of the probable cause inquiry, we must accept these characterizations in the Wacks affidavit as true. Moreover, since de-

fendants never challenge the accuracy of the characterizations contained in the affidavit, except for the characterization of the transcripts as Aladdin-related, we take the other characterizations of the transcripts as true even for the purposes of a *Franks* inquiry.

■ All parties agree that it was public knowledge in early 1979 that the Aladdin was for sale. *See generally* 1 App. III, Ex. K; Defendants' Ex. 160–61. Moreover, the transcripts explicitly linked David and Allen Dorfman to the Aladdin at least to the extent that it showed they were interested in the Aladdin, following what was happening to it, and meeting with "some people" about it. At the same time, the transcripts show that Dorfman, Webbe, Bjornsen, Massa, O'Malley and Williams were talking about and concerned with a "bid". The bid coincides in time to the Aladdin's proposed sale and David and Allen Dorfman's interest in the Aladdin. The bid is further linked to the Aladdin since the bidders were Glick and Glussman, both of whom were involved in casinos. Given the veiled nature of the conversations, we conclude that it was reasonable for Chief Judge Parsons to have accepted Wacks' allegation that the conversations "concerned" the Aladdin. Whether the bid was on the Aladdin, or some other parcel of property related to the Aladdin is unclear, but a reasonably prudent person could have concluded that some link was established by the conversations. On their face, there is little in the transcripts which would lead one to believe that the bid that was withdrawn was not the very same deal regarding the Aladdin that Allen Dorfman had told Sandy LNU related to a deal on the Aladdin that was "dead." No other property except the Aladdin is mentioned in the transcripts, thus it was entirely logical for Chief Judge Parsons to have concluded that the bid referred to was on the Aladdin. In sum, granting Chief Judge Parsons' probable cause determination the deference to which it is entitled, we hold that the Aladdin allegations contained in the March 1 application, as supported by the attached transcripts, establish probable cause to believe that the persons named in the transcripts were engaged in illegal activity, and justify the extension of the wiretap which Chief Judge Parsons authorized on March 1.[29]

■ Defendants argue that the government should have spelled out its theory of linkage between the bid and the Aladdin in the application, so that Chief Judge Parsons could have evaluated it. Defendants argue that, without explaining its theory, the government deprived Chief Judge Parsons of the "underlying facts" necessary to make a probable cause determination. T. 2059–66. As a matter of policy, we might agree with defendants. The application is unduly terse with respect to the Aladdin allegations. It might well have been helpful if Wacks had explained his interpretation of the transcripts in greater detail. However, whatever defects of draftsmanship the application may contain are not of constitutional or statutory magnitude. What were the "underlying facts" behind the Aladdin allegations besides the transcripts themselves? The purpose of the warrant requirement, as stated above, is to ensure that the inferences necessary to support probable cause are drawn by a neutral and detached magistrate. Defendants' complaint, in essence, is not that the government deprived Chief Judge Parsons of the opportunity to draw the Aladdin linkage inference, but that they made him work too hard to draw those inferences. By not explaining their theory, the inference of linkage had to be drawn entirely by Chief Judge Parsons, without help from the government. That may be the case, but it is hardly a violation of the warrant requirement. The government gave Chief Judge

**29.** Defendants argue that the bid referred to could not have been on the Aladdin, since the transcripts mention a purchase price of $1.6 million, which was unrealistically low. *See id.* at 60C, 62G. However, the bid could have been on a fractional interest in the Aladdin. Defendants also claim that it was clear that the bid referred to undeveloped property and/or real estate since terms like "escrow," "construction costs," and "closing costs" were used with reference to the bid. However, we perceive no reason why sales of casinos cannot involve such matters. In any event, Wacks never alleged that the bid was directly on the Aladdin, but only that it "concerned" the Aladdin. The bid could have regarded refinancing of the casino through the sale and/or development of land related to the casino.

Parsons the raw facts, and left inference-drawing to the judge. That is what the

warrant clause requires.[30] Our review of the four corners of the March 1 application

**30.** Defendant O'Malley argues that there was not probable cause to name him as an authorized interceptee on March 1. We reject his argument. The transcript of the January 30 interception indicates that Dorfman and Lombardo agreed to send O'Malley to speak to Williams regarding the bid, in order to gain Williams' cooperation. *See id.* at 54G. In one of the February 13 interceptions, Webbe states that he and O'Malley went to Williams and discussed problems regarding the bid. *See id.* at 60E–60F. In another February 13 interception, Webbe tells Dorfman that O'Malley and Massa are "disgusted" with the way the bids are being handled. *See id.* at 61K–61L. From these transcripts, it was clear that O'Malley was following the progress of the deal, and that he was both interested in and knowledgeable about it. O'Malley may be correct that the transcripts do not indicate that O'Malley was actually engaged in the transaction and that he was merely present when it was discussed. However, this is of no moment. The test for probable cause is not whether O'Malley is guilty or involved in the underlying offense, but whether it is reasonably probable that evidence of the crime will be obtained by listening to him. Whether or not he was involved, the transcripts indicate that O'Malley probably was knowledgeable about the deal, and that as a result, there was a reasonable probability that evidence regarding the deal would be obtained by listening to O'Malley's conversations.

Even if O'Malley is correct that there was not probable cause to name him as an interceptee, this may not require the suppression of any evidence. All O'Malley's argument amounts to is the contention that even if the warrant lawfully authorized the seizure of the conversations of others, it did not lawfully authorize the seizure of his conversations. It is well settled that if a warrant is facially sufficient as to some but not all of the items which it states may be seized, then the warrant is not invalid in toto, but only is invalid as to the particular items the seizure of which was not sufficiently justified. *See* 2 W. LaFave, *supra* p. 13 § 4.6(f).

O'Malley accepts this proposition, but states that his argument is based not on the fourth amendment, but on the statute, which contains a broader suppression remedy than does the fourth amendment, under which the general proposition stated above developed. T. 2023–39. This argument overlooks the fact that the Supreme Court has stated that Title III was not generally intended to expand the scope of the suppression remedy beyond that contained in the fourth amendment. *See Scott v. United States*, 436 U.S. 128, 139, 98 S.Ct. 1717, 1724, 56 L.Ed.2d 168 (1978). In any event, it makes little sense to invalidate the warrant in its entirety, even as to items which Chief Judge Parsons lawfully ordered seized, merely because

the warrant authorized seizure of additional items as well. Logically, the suppression remedy should include only items which the government would not have been able to seize but for the invalid portion of the warrant. *United States v. Donovan*, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977), argues strongly for this result. There, the government failed to name all the individuals for whom it had probable cause in the application, in violation of 18 U.S.C. § 2518(1)(b)(iv) (1976). The Court held that suppression was not required.

This case is unlike *Giordano* [*v. United States*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1975)], where failure to satisfy the statutory requirement of prior approval by specified Justice Department officials by-passed a congressionally imposed limitation on the use of the intercept procedure. The Court there noted that it was reasonable to believe that requiring prior approval from senior officials "would inevitably foreclose resort to wiretapping in various situations where investigative personnel would otherwise seek intercept authority from the court and the court would very likely authorize its use." 416 U.S. at 528 [94 S.Ct. at 1832]. Here, however, the statutorily imposed preconditions to judicial authorization were satisfied, and the issuing judge was simply unaware that additional persons might be overheard engaging in incriminating conversations. *In no meaningful sense can it be said that the presence of that additional information as to additional targets would have precluded judicial authorization of the intercept.* 429 U.S. at 435–36, 671–72 (footnote omitted) (emphasis supplied).

Here, similarly, the deletion of O'Malley's name as an authorized interceptee from the March 1 order would not have precluded judicial authorization for the intercept; there was still probable cause for the other named interceptees. It is illogical to suppress conversations which could have been lawfully intercepted even had the government omitted the allegedly tainted allegations regarding O'Malley, since the government's allegedly improper failure to omit O'Malley would not "have precluded judicial authorization of the intercept." In every conversation during which O'Malley was intercepted and which the government seeks to introduce at trial, O'Malley was speaking with a properly named interceptee. Thus, the government could have properly seized all these conversations under the valid part of the warrant, assuming that the O'Malley allegations were invalid. In short, the issue of whether O'Malley was properly named as an interceptee simply is not material; no conversations were intercepted solely on the basis of the allegedly invalid part of the warrant. Thus, we follow the holding of the Ninth Circuit that the government need not demonstrate probable

persuades us that the Aladdin allegations were sufficient to justify the March 1 extension, and that those allegations were supported by sufficient underlying facts to satisfy the requirements of Title III and the fourth amendment.

### B

We granted defendants a *Franks* hearing on their claim that the March 1 Aladdin allegations were made in bad faith. Defendants' offer of proof established that the linkage asserted in the application between the "bid" conversations and the Aladdin was a misstatement. Indeed, the government now concedes that in reality, the "bid" conversations were unrelated to the Aladdin, and in fact involved a parcel of property located near the Las Vegas Country Club known as "Wonderworld." [31] Since, as we held above, the March 1 application stands or falls on the Aladdin allegations alone, these allegations are material within the meaning of *Franks*. [32] Moreover, while the question was not free from doubt, we were of the view that the conversations relied on by the government to establish its now discredited linkage theory were sufficiently ambiguous to warrant further factual inquiry into the good faith of Wacks and Tonkovich when they advanced the linkage theory to Chief Judge Parsons on March 1.

Since the defendants had established as a matter of law that the March 1 allegations regarding a plan to acquire a hidden interest in the Aladdin were material misstatements, the issue at the hearing was whether these misstatements were made intentionally, or in reckless disregard of the truth.

It is apparent that Wacks and Tonkovich knew by March 1 that the property which was being discussed in the bid conversations was not the Aladdin, but a separate parcel. *See, e.g.,* T. 1353–54, 1498–99, 1723. *See also* Defendants' Ex. 164–66. At the hearing, Wacks and Tonkovich testified, however, that the Aladdin allegations were justified since they believed the bid on the property being discussed was related to the Aladdin, for the reasons discussed in Part IV–A, *supra*. For example, Tonkovich testified,

Q: [By Mr. Tucker] Well, you knew, if I understand it—if not by February 16th, pretty soon thereafter, that these conversations [included in the March 1 application] which related to a bid of $1.6 million, seven acres of land, homeowners, and so on, and so forth, that those related to a separate piece of real estate, not the Aladdin, correct?

A: That's correct.

Q: And the only basis upon which you or Agent Wacks was telling you that those conversations had anything to do with hidden interests in casinos was some belief that there might be—and that is Agent Wacks' language—might be a tie in between that land and the—the bids on that land and the Aladdin, right? That was your theory at that point in time.

A: No, I wouldn't say that. That's not the only basis for it.

Q: Well, you had two conversations that you had intercepted, one I believe on January 30, one on February 1, right?

A: I don't remember specifically—

Q: In which Dorfman and Sandy LNU spoke about the Aladdin specifically?

A: Right in the beginning. I don't remember specific dates.

Q: As of the 16th of February, had Agent Wacks given you any other infor-

---

cause for every person named as an interceptee in the order, and that suppression is not required merely because one person named as an interceptee was placed in the order without probable cause. *United States v. Martin*, 599 F.2d 880, 884–85 (9th Cir. 1979).

**31.** The indictment in this case proceeds on the theory that defendants sought to obtain the assistance of Sen. Howard Cannon of Nevada in opposing then-pending legislation deregulating the trucking industry by inducing the Fund,

which owned Wonderworld, to sell it to a group headed by Sen. Cannon at a favorable price, and to induce those bidding against the Senator's group to withdraw.

**32.** Concommitantly, any misrepresentations which may be contained in the March 1 application regarding Bingo Palace, Horseshoe or Slots-A-Fun are not material within the meaning of *Franks*.

mation, other than the existence of those two calls, to support the theory or idea that the Wonderworld conversations had some link with the Aladdin?

. . . . .

A: Well, you have to understand that if you are just segregating those two calls, you have to put it in the context of the fact that this was a hidden interest investigation. There was a number of—there was a lot of information relating to hidden interests that we had in the informant information, what we knew previously, the fact that those calls were calls that were right at the same time of the calls that related to what we now know as Wonderworld, and it seemed reasonable to believe that that was a hidden interest call and that they were connected. It is easy to look back now three years later and to view that, but at the time it certainly seemed reasonable as they were coming in the calls [sic].

T. 1713–16. To similar effect, see, e.g., T. 1363–66, 1738–40.

Defendants' theory is as follows. Defendants respond to the government's linkage theory by pointing out that the theory was never explained to Chief Judge Parsons. See, e.g., T. 1758–64. Instead, Tonkovich and Wacks misled Chief Judge Parsons into believing the bid was directly on the Aladdin. The inference of an intent to mislead is strengthened by the fact that when the FBI started to intercept conversations which rather explicitly indicated that the bid was not on the Aladdin itself, transcripts of the conversations were not submitted to Chief Judge Parsons. See Defendants' Ex. 170–76.[33] Wacks' credibility is further undermined because he continued to represent to Chief Judge Parsons in his affidavits that calls pertinent to Bingo Palace, Slots-A-Fun and Horseshoe were being intercepted, when this was not the case. See T. 1586–1636.[34] In sum, defendants argue, the failure to spell out the linkage theory represents a conscious decision to be less than candid with Chief Judge Parsons, and that coupled with the fact that the transcripts revealed the relationship between the bid conversations and the Aladdin was tenuous at best, means that Wacks and Tonkovich either intended to mislead Chief Judge Parsons, or proceeded in reckless disregard for the truth.

While defendants' argument does have a certain force, it does not carry the day. As an initial matter, defendants are incorrect when they state that the March 1 application indicates that the "bid" was directly on the Aladdin. In fact, the application states only that the conversations "concern" a hidden interest in the Aladdin. This language surely encompasses a linkage theory. Moreover, the testimony indicates that the linkage theory was not spelled out in greater detail because the government was concerned about compromising the identities of its confidential informants. See T. 1758–64.[35] In light of the language of the application, it is not quite fair to say that the application led Chief Judge Parsons to believe that the bid was "on" the Aladdin when Tonkovich and Wacks knew it was not. In fact, much of the language of the

33. Defendants also argue, at some length, that Wacks also misled the Department of Justice attorneys assigned to the case regarding the linkage theory. See T. 1984–92. However, whether this was the case is immaterial. We are concerned only with the good faith of Wacks' representations to Chief Judge Parsons.

34. This testimony was originally taken as an offer of proof, but since substantially all of the testimony involved was in fact adduced, and since the government neither renewed its objection to the offer nor moved to strike it, we have considered the testimony on the merits.

Defendants also argue that Wacks' testimony indicates he knew the linkage theory was meritless, since the facts he stated he learned from a confidential informant on April 10 which convinced him there was in fact no linkage were actually known to him back in February. T. 1515, 1994. However, this is factually incorrect. On April 10, Wacks learned for the first time that the alleged plot to bribe Senator Cannon was definitely not casino-related, and learned other details of the plot which he had never previously known. T. 1515–22; Defendants' Exhibit 30 at 21–22, 32–34.

35. Under 18 U.S.C. § 2518(9) (Supp. II 1978) defendants are entitled to receive copies of the Title III applications of right.

transcripts that were submitted to Chief Judge Parsons seem to indicate that in fact the bid referred to may not have been on the Aladdin, but on other property. *See* note 29 *supra.*

 Moreover, defendants' burden under *Franks* is to demonstrate intentional falsehoods or reckless disregard for truth. Defendants have produced little evidence of intent; nothing in either the transcripts of intercepted conversations or the other information made available to Wacks and the Department of Justice attorneys is flatly inconsistent with a linkage theory. To prove recklessness, much less intent, defendants must demonstrate, as we held at p. 368–369 *supra*, the actual presence of substantial doubts as to the truth of the linkage theory in the minds of the applicants, or obvious reasons that they should have doubted the information. Yet, if there is one word which does not describe the conversations the government believed were Aladdin-related, it is "obvious". All the conversations are easily characterized as veiled. *See, e.g.*, T. 1478–80. In light of the ambiguity that runs rampant in the transcripts, we cannot conclude that the characterization of the conversations as Aladdin-related was in bad faith.

 The linkage theory advanced in the March 1 application is further enhanced by Defendants' Ex. 168, a United States Department of Labor report indicating that the Fund had made loans to, and had an interest in the Aladdin. Wacks testified that he learned these facts from his conversations with Special Agent Richard Huston of the FBI, who had contacted the Department of Labor, and had further learned that Victor Palmieri and Company managed Fund assets west of the Mississippi. *See* T. 1235–36, 1242, 1375–77. Thus, the references to Palmieri in the "bid" conversations as the entity handling the "bid" suggested a link to the Aladdin, since Wacks knew that Palmieri managed the Fund's interest in the Aladdin. This in turn suggests Wacks' good faith when he advanced his linkage theory in the March 1 application.

Two additional factors lead to the conclusion that the government did not intend to or recklessly mislead Chief Judge Parsons. First, the March 1 application, like all the extension applications in this case, included the actual transcripts which Wacks was relying on to establish his linkage theory. The application thus permitted Chief Judge Parsons to examine the underlying facts and draw his own conclusions as to whether the transcripts involved Aladdin-related transactions. The government did little to characterize the transcripts; it let Chief Judge Parsons draw his own conclusions. As Tonkovich testified, "Well, we didn't submit my belief. We submitted the entire transcripts of those conversations." T. 1753. Second, internal Department of Justice documents indicate that Wacks and his colleagues involved in the electronic surveillance really did believe in the linkage theory. The summaries of pertinent intercepts which were prepared by the FBI agents involved in this case were coded, and the "bid" related conversations were coded into two separate files, one on the Aladdin, and one on "golf course property" which was a reference to Wonderworld.[36] This double coding procedure indicates that the agents really did believe that the "bid" conversations, which the government now concedes were related to Wonderworld, were linked in some way to the Aladdin. Additionally, a teletype sent from the Chicago field office of the FBI to the Director, dated February 14, 1979, states that the "bid" calls "relate to" the Aladdin. *See* Defendants' Ex. 163.

---

**36.** *See, e.g.*, Government's Ex. 11, NDI 166, 2:31 P.M. (February 2, 1979); NDI 166, 10:15 (March 5, 1979); NDI 174, 10:45 A.M. (March 14, 1979); NDI 165, 3:41 P.M. (March 19, 1979); NDI 164, 12:23 P.M. (April 6, 1979). *See generally* Defendants' Exhibit 102.

The linkage theory is further enhanced since certain February calls not contained in the March 1 application made it clear that the "bid" was on property located in Las Vegas, giving the government yet another link between the "bid" and the Aladdin. *See, e.g., id.* NDI 167, 1:00 P.M. (February 12, 1979).

Certain summaries from Government's Exhibit 11 are also contained in Defendants' Exhibits 100 and 101.

As counsel for O'Malley points out, "they never, never intentionally mislead the Director." T. 2017. This teletype is persuasive evidence that the FBI truly believed in its linkage theory, and did not offer it for the purpose of misleading Chief Judge Parsons.[37]

For the reasons outlined above, defendants have failed to demonstrate that the incorrect March 1 Aladdin allegations were either intentional misrepresentations, or made with reckless disregard for the truth. There was no *Franks* violation on March 1.

## V

On March 30, 1979, the government applied for an extension of the Title III order through Thomas J. Fleischmann, a Department of Justice attorney. The application sought authority to continue the tap at Amalgamated, and to intercept the conversations of Allen Dorfman, Sol Schwartz, Abe Chapman, Anthony LaMonica, Samuel LaMonica, Carl Thomas, Lombardo, Webbe, Mildred Watson, David Dorfman, Sandy LNU, Bjornsen, Glick, O'Malley, Chris Christensen, Ed Talbot and others yet unknown. The application was again supported by Wacks' affidavit and transcripts of conversations previously intercepted.

## A

The January 29 Bingo Palace, Slots-A-Fun and Horseshoe allegations were repeated in the March 30 application and affidavit, supported only by updated information from CI # 1, # 2 and # 3. These allegations fail to provide probable cause for the same reasons that their predecessors were insufficient on March 1.

The March 30 application also contained the same set of Aladdin allegations that had first appeared on March 1. The allegations were supported by essentially the same transcripts that had been included on March 1, together with a number of additional transcripts. A February 22 call between Bjornsen and Webbe was included, in which Webbe states that he intends to go to Las Vegas to discuss the "deal"—referring to the "bid" discussed in Part IV–A, *supra* —with Dorfman and others. *See* 2 App. I, Application of March 30, 1979, Ex. B at 87–87G. A March 9 call between Bjornsen and Webbe was also included, in which they discuss the mechanics of the "bid" and "Palmieri's" concerns about it. *See id.* at 90– 90G. Finally, two March 19 transcripts were provided to Chief Judge Parsons in the application. In the first, David Dorfman tells Webbe that "we're" going to "doctor up an offer" to purchase "the six acres . . . the uh, Las Vegas Country Club property." *See id.* at 91–91L. In the second, Bjornsen tells David Dorfman that he has "double checked that package on the casino" and fills him in on the casino's operations. *See id.* at 92–92L.

If anything, the probable cause showing on the Aladdin allegations is stronger on March 30 than it was on March 1, since the transcripts reinforce the link between the "bid" and the Aladdin. The February 22 call shows that the bid probably involves Las Vegas property, and Bjornsen, who up to March 19 has been involved solely with the "bid," refers in the March 19 call to a "casino package" with which he has been involved. The inference is unmistakably clear that the bid Bjornsen has been working on is his attempt to front for David Dorfman and others in their attempt to

---

**37.** Defendants' argument that Wacks' inclusion of the Bingo Palace, Slots-A-Fun and Horseshoe allegations in his extension application affidavits impeaches his credibility is not without force. Certainly Wacks was wrong to continue to include those allegations even after it was clear that no pertinent conversations were being intercepted. However, this evidence is of limited probative value. The testimony regarding these allegations is inadmissible under Fed. R.Evid. 608(b), since defendants relied on extrinsic evidence to prove the falsity of these

allegations, contrary to the command of the rule. Moreover, while we have considered the evidence, we note that it is of dubious value, since it relies on a propensity inference: if Wacks misled Judge Parsons on one occasion, he would do it on others. That is the exact sort of inference considered suspect and of marginal probative value under Fed.R.Evid. 404(b). Thus, defendants' reliance on these allegations is insufficient to rebut the evidence of good faith regarding the linkage theory which is discussed above.

acquire a hidden interest in a casino. The Aladdin allegations were supported by probable cause on March 30.

However, the government need not rely on the Aladdin allegations in order to support the March 30 allegations, since the application also contains an entirely new set of allegations which independently establish probable cause with respect to an attempt to offer kickbacks with the intent of influencing the operation of an employee benefit plan, in violation of 18 U.S.C. §§ 371 and 664 (1976).

The allegations were supported by hearsay statements which Wacks attributed to a new informant, CI # 7. CI # 7 stated that the Fund's trustees were negotiating with two individuals, Chris Christensen ("Christensen") and Ed Talbot ("Talbot") who were seeking to write errors and omissions bonds for the trustees. Talbot and Christensen, according to CI # 7, owned the Casualty and Indemnity Company, Ltd., located in Belize City, Belize, Central America ("C & I"). C & I was allegedly a "scam company" because its assets were in fact non-existent. C & I possessed fraudulent securities which it deposited in foreign banks and which enabled it to obtain a line of credit although it had, in reality, no legitimate assets.

CI # 7 went on to state that at a meeting in Miami, Florida on January 18 and 19, 1979, the trustees had reached a tentative agreement with Christensen and Talbot to purchase the bonds from C & I. The Fund would pay a premium to C & I, of which 10 percent would be kicked back to the trustees, and 20 percent to Dorfman through Amalgamated. The Fund would also initially invest $5 million in C & I at a low rate of return, and later invest a like amount. CI # 7 indicated that C & I was seeking to purchase the Kokomo National Life Insurance Company, located in Kokomo, Indiana in order to enable it to operate in the United States and obtain the approval of the Department of Labor to deal with the Fund.

As the government concedes, CI # 7's allegations must be tested under the standards of *Aguilar/Spinelli.* As to the first prong, CI # 7 stated that his allegations were based on his personal observation of the conspirators, and Wacks stated that CI # 7's information had been updated in the first week of March. Given the ongoing nature of the conspiracy, the allegations were not stale, and given the fact that they are based on personal observation and are highly specific, there is ample basis to conclude that they are based on something more substantial than casual rumor. The first prong of *Aguilar/Spinelli* is satisfied.

As to the second prong, Wacks stated the CI # 7 had provided information in the past to the FBI regarding major thefts and manipulation of securities which had been independently corroborated by the FBI. As a result, Wacks considered CI # 7 reliable. The specificity of the information provided also enhanced its reliability. Finally, ample corroboration of CI # 7's allegations is found in the transcripts that Wacks included in the application.

The application contained a transcript of a February 1, 1979 conversation between Jim Kalil and Marty Wolfinsohn, who was an Amalgamated employee. In it reference is made to Sol Schwartz' involvement in some sort of underhanded scheme involving kickbacks. The scheme was said to involve the Fund's plan to purchase a $5 million annuity, and a ten percent fee paid to a company located in south Central America. A meeting involving the scheme was also referred to as having taken place in Florida. *See* 2 App. I, Application of March 30, 1979, Ex. B at 100–00W. A February 12 call was included, in which Jim Lanigan, a Fund attorney, spoke to Sol Schwartz and was told that Christensen was waiting to hear from him. *See id.* at 101–01C. A February 13 call was intercepted in which Lanigan spoke with Schwartz again, and told Schwartz that he had contacted the Director of Insurance in Indiana regarding Kokomo National Life Insurance Company. *See id.* at 102–02C. A transcript dated February 13 reveals that Talbot had called Schwartz, explaining that Christensen had told him to call. Schwartz stated that there were prob-

lems developing with the deal because the Fund's attorneys had contacted the Indiana Insurance Department. He also stated that the deal was a "great, ah, ah, an opportunity for all of us." *See id.* at 103–03J. A February 16 transcript indicated that one Charles Rosenthal called Schwartz and discussed Christensen and Talbot's proposal and the meeting in Florida. *See id.* at 105–05D. Finally, a February 20 transcript of a conversation between Schwartz and Talbot reveals that Schwartz was preparing to meet with the Fund's attorneys, and thought he might need Christensen and Talbot's help at the meeting. Reference was also made to depositing a check for $5 million at a bank designated by "Kokomo." *See id.* at 106–06D.

 These transcripts provide ample corroboration of important elements of CI # 7's allegations, and therefore an adequate basis for the reliability of the hearsay attributed to CI # 7. CI # 7's allegations pass muster under both prongs of *Aguilar/Spinelli* and independently provide probable cause to continue the Title III surveillance on March 30.[38]

### B

Defendants were granted a *Franks* hearing on the Aladdin allegations contained in the March 30 application for the same reasons that they received such a hearing on the March 1 Aladdin allegations. However, defendants' March 30 *Franks* claim, based on the evidence adduced at the hearing, fares no better than did their March 1 claim.

The factors which led us to conclude that the linkage theory underlying the Aladdin allegations was advanced in good faith on March 1 apply equally to March 30. The language of the application, the veiled nature of the conversations, Wacks' knowledge of a link between Victor Palmieri and Company and the Aladdin, Wacks' submission of the actual transcripts in the application, and the internal Department of Justice documents placed in evidence at the hearing all point to the conclusion that Wacks and Fleischmann did not intentionally or recklessly mislead Chief Judge Parsons. If anything, defendants' *Franks* theory is even weaker on March 30 than on March 1, for at least three reasons. First, the presence of the C & I scheme allegations in the March 30 affidavit as a separate basis for probable cause may mean that the March 30 Aladdin allegations are not "material" under *Franks.*[39] Second, the March 19 transcript which was submitted to Chief Judge Parsons of a conversation between David Dorfman and Webbe completely destroys defendants' theory that the government intentionally or recklessly led Chief Judge Parsons to believe that the "bid" conversations involved a bid directly on the Aladdin, when the government knew this was not the case. The transcript unambig-

---

**38.** Defendants argue that the C & I scheme allegations were stale, since no conversation had been intercepted which involved them since February 20. While this is of some concern, it must be borne in mind that the C & I scheme is the sort of complex and ongoing conspiracy that is not likely to be quickly consummated. For example, it is reasonable to assume that the Fund's attorneys would take some time after the meeting referred to in the February 20 intercept transcript as upcoming before deciding whether to approve C & I's offer. Moreover, it is also logical to assume that relevant conversations might have taken place over Amalgamated's lines subsequent to February 20, but were not monitored or reported as pertinent by the monitoring agents, since until Chief Judge Parsons approved the C & I scheme allegations on March 30, the FBI lacked authority to listen for calls related to that scheme, especially when they involved persons such as Talbot, Christensen, Kalil and Wolfensen, who were not authorized interceptees under the January 29 and March 1 orders. In light of these considerations, and mindful that the staleness inquiry is necessarily a relative one, we are of the view that the C & I allegations were not stale because of the failure to intercept a related conversation for approximately 30 days prior to the time the March 30 application was prepared.

**39.** Defendants do not attempt to make a *Franks* showing with respect to the C & I scheme allegations. Nevertheless, we will treat the *Franks* claim on March 30 as involving material allegations, since those allegations were necessary to sustain at least part of the authority the government received from Chief Judge Parsons on March 30.

uously reveals that the bid was not on the Aladdin but on six acres of Las Vegas Country Club property. *See* 2 App. I, Application of March 30, 1979, Ex. B at 91–91L. Defendants' assertion that the government sought to lead Chief Judge Parsons to believe the bid was on the Aladdin by withholding any transcripts which indicated otherwise is unsupportable in light of the submission of this transcript on March 30. Third, the March intercepts seemed to establish a link between Bjornsen, the man who was involved in the "bid," and a casino transaction, in light of the March 19 conversation between David Dorfman and Bjornsen that was submitted to Chief Judge Parsons. *See id.* at 92–92L. This strengthened the linkage theory, and enhanced the government's justification for advancing it. Accordingly, defendants' *Franks* claim as to the March 30 application and order is rejected.

## VI

▮ On April 7, 1979, the government, once again through Fleischmann, supported by Wacks' affidavit, submitted a Title III application to Chief Judge Parsons. The April 7 application sought authority to extend the electronic surveillance to two telephone lines at Dorfman's personal residence in Deerfield, Illinois, a private line of Webbe's at Amalgamated, and to electronically intercept oral conversations taking place at Amalgamated in the offices of Webbe and Dorfman. Defendants' attack on the April 7 application is brief, as will be our discussion of it.

The April 7 application was supported by essentially the same information that had been included in the March 30 application, and defendants essentially repeat the arguments that they made against the March 30 application on both probable cause and *Franks* grounds. We need not repeat here our view as to why those arguments fall short of the mark. Suffice it to say that those issues were fully discussed in Part V, *supra.*

Defendants' only new attack on the April 7 application is that the Aladdin allegations it contains were based on stale information. However, the application did contain a summary of a recently intercepted call which belies defendants' claim. The Wacks affidavit states that on March 29, a call was intercepted between Webbe and Williams in which Williams inquires as to the status of the deal "out west." Webbe replies that the deal is still alive and that Bjornsen and others are still working on finalizing it. 3 App. I, Application of April 7, 1979, Ex. B at 89D. The reference to a deal "out west," and the involvement of Webbe and Bjornsen linked this conversation to the previous "bid" conversations, which we have held were properly linked to the Aladdin. The conversation also demonstrates that the transaction was ongoing as of March 29, a sufficiently recent date so that Chief Judge Parsons was correct to conclude, in light of the prolonged nature of the criminal activity alleged in the application, that the Aladdin allegations were not stale.

In all other respects, defendants' probable cause and *Franks* arguments duplicate those advanced with respect to March 30, and should be rejected for the same reasons as were discussed in Part V, *supra.*[40]

## VII

Defendants' final line of attack focuses on alleged defects in the applications submitted by the government and the orders issued by Chief Judge Parsons under the statutory scheme enacted by Congress in Title III. *See* 18 U.S.C. §§ 2510–20 (1976 & Supp. II 1978). The defendants contend, *inter alia*, that the applications and orders do not set out with sufficient particularity the place to be searched, and items to be seized, § 2518(1)(b), (4)(c), and (5); fail to limit adequately the scope of the authorized surveillance, § 2518(5); do not adequately disclose prior related wiretaps, § 2518(1)(e); fail to comply with the requirement that the government establish the need for electronic surveillance, § 2518(1)(c); and finally

---

**40.** The April 7 application does raise some statutory issues with respect to the need for expanding the Title III surveillance. These are discussed in Part VII–C, *infra.*

that the government failed to timely apply for permission to use the intercepted conversations in the case at bar, § 2517(5). Defendants further contend that even if the applications and orders are deemed sufficient under the statute, the government's conduct during the surveillance violated the court orders and the statute.

### A

Title III was passed by Congress in large part as an attempt to structure an electronic surveillance statute in compliance with the holdings of the Supreme Court in *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) and *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). See. S.Rep. 1097, supra p. 31 at 27, 66, 2112, 2153. In *Berger* the Court held that any authorization to intercept conversations by electronic means must meet the particularity requirement of the fourth amendment's warrant clause and adequately describe the place to be searched and the thing to be seized. 388 U.S. at 55–58, 87 S.Ct. at 1881–83. The New York statute at issue in *Berger* was found wanting because it lacked any particularity requirement; it only required probable cause that evidence of a crime might be obtained by the eavesdrop without detailing what crime was at issue and what conversations were to be seized. *Id.*

In response to this concern with particularity Congress required in Title III that every application contain information detailing the particular offense under investigation, the nature and location of the property where the interception is to take place, the type of communications sought to be intercepted and the persons known to be committing the alleged offense. *See* § 2518(1)(b)(i)–(iv). In addition any order authorizing oral interception must contain "a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates", § 2518(4)(c), and instructions to the effect that "[e]very order and extension thereof ... shall be conducted in such a way as to minimize the interception under this chapter," § 2518(5).[41] These statutory commands are adequate to embody the particularity requirement of the fourth amendment in the context of electronic surveillance. *See United States v. Licavoli*, 604 F.2d 613, 620 (9th Cir. 1979), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980); *United States v. Tortorello*, 480 F.2d 764, 779–80 (2d Cir.), *cert. denied*, 414 U.S. 886, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973); *United States v. Bynum*, 386 F.Supp. 449, 460 (S.D.N.Y.1974), *aff'd*, 513 F.2d 533 (2d Cir. 1975); *United States v.*

41. The Supreme Court has decided several cases under Title III and has yet to express any doubt that the statute is sufficient to meet the constitutional objections raised in *Berger* and *Katz. See Scott v. United States*, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978); *United States v. Donovan*, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977); *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974); *United States v. Chavez*, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974); *United States v. Kahn*, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). Moreover, lower courts which have considered the question have held almost unanimously that Title III is sufficient to meet the commands of the fourth amendment. *See United States v. Turner*, 528 F.2d 143, 158–160 (9th Cir.), *cert. denied*, 423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975); *United States v. Ramsey*, 503 F.2d 524, 526–32 (7th Cir. 1974), *cert. denied*, 420 U.S. 932, 95 S.Ct. 1136, 43 L.Ed.2d 405 (1975); *United States v. Martinez*, 498 F.2d 464, 467–68 (6th Cir.) *cert. denied*, 419 U.S. 1056, 95 S.Ct. 639, 42 L.Ed.2d

654 (1974); *United States v. James*, 494 F.2d 1007, 1012–13 (D.C.Cir.1974); *United States v. Tortorello*, 480 F.2d 764, 771–75 (2d Cir.), *cert. denied*, 414 U.S. 866, 38 L.Ed.2d 86 (1973) (substantially similar New York state statute); *United States v. Whitaker*, 474 F.2d 1246 (3d Cir.), *cert. denied*, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973), *rev'g*, 343 F.Supp. 358 (E.D.Pa.1972); *United States v. Cafero*, 473 F.2d 489, 493–501 (3d Cir. 1973), *cert. denied*, 417 U.S. 918, 94 S.Ct. 2662, 41 L.Ed.2d 223 (1974); *United States v. Cox*, 462 F.2d 1293 (8th Cir. 1972), *cert. denied*, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974).

We agree with the overwhelming authority that the statute is sufficient to meet the requirements of the Constitution and believe that further discussion on the subject, already exhaustively treated elsewhere, would not be helpful. Our discussion, therefore, focuses on the statutory requirements which may in fact be more restrictive than the Constitution requires. *See United States v. Ramsey*, 503 F.2d at 531.

*Mainello,* 345 F.Supp. 863, 871 (E.D.N.Y. 1972).

> The Fourth Amendment requires specification of the "place to be searched and the person or things to be seized." In the wiretap context, those requirements are satisfied by identification of the telephone line to be tapped and the particular conversation to be seized.

*United States v. Donovan,* 429 U.S. 413, 427 n. 15, 97 S.Ct. 658, 668 n.15, 50 L.Ed.2d 652 (1977). In interpreting the sufficiency of the application and order we apply a "commonsense" reading of the language taken as a whole and avoid "hypertechnical" interpretations. *United States v. Ventrasca,* 380 U.S. 102, 108–09, 85 S.Ct. 741, 745–46, 13 L.Ed.2d 684 (1965).

▬▬ The defendants here challenge the sufficiency of the application's description of the premises where the surveillance took place. In interpreting the sufficiency of the description we are mindful of the fact that Title III, like the fourth amendment, protects people, not places. *See Katz v. United States,* 389 U.S. at 351, 88 S.Ct. at 511; *United States v. Tortorello,* 480 F.2d at 780; *United States v. Bynum,* 386 F.Supp. at 460. Thus, the purpose of the description of the premises is to inform the authorizing judge of the privacy interests involved in permitting surveillance of particular telephone lines. Technical accuracy in the order or application is not required. *See United States v. Feldman,* 606 F.2d 673, 680 (6th Cir. 1979); *United States v. Sklaroff,* 506 F.2d 837, 840 (5th Cir.), *cert. denied,* 423 U.S. 876, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975). The orders here correctly describe the place to be searched by listing the address where the interception was to take place and the telephone numbers involved. More importantly, reading the application and affidavit as a whole they clearly describe the nature and use of the premises as required by § 2518(1)(b).[42] Defendants' contention that the affidavit failed to disclose the number of employees at Amalga-

mated and the volume of calls coming over the lines is the type of technical detail which is not required. Where it is clear that the authorizing judge was informed of the nature and use of the premises generally, and the order specifically identifies the premises and which lines are to be tapped, the place to be searched requirements of the fourth amendment and the statute are satisfied.

The second aspect of particularity is the identification of the items to be seized in the course of the search. This prong of the particularity test is addressed by § 2518(4)(c), requiring identification of the offense to which the communications must relate, and the directive to minimize the interception of unrelated · conversations, § 2518(5). *See United States v. Clerkley,* 556 F.2d 709, 715 & n. 3 (4th Cir. 1977); *United States v. Daly,* 535 F.2d 434, 440–41 (8th Cir. 1976); *United States v. Tortorello,* 480 F.2d at 779, *see* S.Rep. 1097 supra p. 31, at 103, 2192.

▬▬ Electronic surveillance, by its very nature, involves difficulties in identifying with particularity the things to be seized. A conversation, unlike physical evidence, cannot be described with precision, nor can it be immediately determined upon "observing" it whether it is subject to the warrant or order. Thus, the recognition that electronic surveillance is permissible at all under the fourth amendment, requires adoption of a flexible approach which takes into account the difficulties of identifying the conversations to be seized. *See Scott v. United States,* 436 U.S. 128, 140–42, 98 S.Ct. 1717, 1724–25, 56 L.Ed.2d 168 (1978); *Andresen v. Maryland,* 427 U.S. 463, 482 n. 11, 96 S.Ct. 2737, 2749 n.11, 49 L.Ed.2d 627 (1976). The Second Circuit recognized the problem in Tortorello:

> [A] pragmatic approach has been taken with respect to the particularity requirement. A specific crime or a specific se-

---

**42.** *See* 1 App. I, Order of January 29 at 1–2; Affidavit of January 29 at 25, 29, 41, 43. The information, identifying the nature of the business and indicating the high volume of insur-

ance handled by the office, was contained in all subsequent affidavits in support of applications for extensions.

ries of related crimes must be identified. Although the nature and type of the anticipated conversations must be described, the actual content need not and cannot be stated since the conversations have not yet taken place at the time the application is made and it is virtually impossible for an applicant to predict exactly what will be said concerning a specific crime. *United States v. Sklaroff*, 323 F.Supp. 296, 307 (S.D.Fla.1971). The order must be broad enough to allow interception of any statements concerning a specified pattern of crime. In determining whether the order and application are sufficiently particular, the papers as a whole must be considered, including especially those portions which recite facts intended to establish probable cause.

*United States v. Tortorello*, 480 F.2d at 780.

 The principal mechanism for insuring particularity is the description of the crime to which the interceptions must relate. *See* § 2518(4)(c). Where the alleged offense is set out with sufficient detail and the authorization permits interception of any conversations relating to that offense, the statute and the Constitution are satisfied. *See United States v. Jacob*, 657 F.2d 49, 52 (4th Cir. 1981) (seizure of documents); *United States v. Brien*, 617 F.2d 299, 307 (5th Cir.), *cert. denied*, 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980); *United States v. Licavoli*, 604 F.2d at 620; *United States v. Cohen*, 530 F.2d 43, 45–56 (5th Cir. 1976); *United States v. Loften*, 518 F.Supp. 839, 844 (S.D.N.Y.1981); *Losinno v. Henderson*, 420 F.Supp. 380, 385–86 (S.D.N.Y.1976); *United States v. Ripka*, 349 F.Supp. 539, 542 (E.D.Pa.1972),

*aff'd*, 480 F.2d 918 (3d Cir. 1973). In the instant case the January 29 application and affidavit were sufficient to establish probable cause to investigate the alleged promotion, management and attempts to acquire hidden interests in Nevada gaming establishments in violation of the Nevada Gaming Control Act, Nev.Rev.Stat. §§ 463.160, 463.170, 463.200, 463.360, 463.520, 463.530 (1977); the Racketeering and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1952, 1961–63 (1976); and conspiracy laws, 18 U.S.C. § 371 (1976). *See* p. 370 *supra*.[43] The order in this case limits the authorized objective to interception of evidence of the named offenses and the "manner in which" the named individuals participate in the promotion, management or attempts to acquire hidden and unlawful interests in Las Vegas and Reno, Nevada gambling casinos.[44] Warrants far more general in language than this, authorizing the seizure of "any evidence" so long as it is related to a specified crime, have been held to meet the particularity requirements. *See Andresen v. Maryland*, 427 U.S. 463, 479–481, 96 S.Ct. 2737, 2748–49, 49 L.Ed.2d 627 (1976); *see also United States v. Bithoney*, 631 F.2d 1, 2 (5th Cir. 1980), *cert. denied*, 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1981) (seizure of documents); *United States v. Licavoli*, 604 F.2d at 620; *In Re Search Warrant Dated July 4, 1977*, 572 F.2d 321, 323–28 (D.C.Cir.1977) (per curiam), *cert. denied*, 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978) (seizure of documents); *United States v. Cohen*, 530 F.2d at 46; *United States v. Tortorello*, 480 F.2d at 481.[45]

---

43. *See* 1 App. I, Application of January 29, and accompanying affidavit as discussed *supra*.

44. *See id.*, Order of January 29 at 6–7. Subsequent orders insofar as they relate to the same offense contain similar language.

45. Defendants attempt to compare the order in the instant case with warrants struck down as overbroad in *United States v. Roche*, 614 F.2d 6 (1st Cir. 1980) and *In Re Application of LaFayette Academy*, 610 F.2d 1 (1st Cir. 1979). The *Roche* case makes clear that while the application at issue described the alleged offense with particularity, the warrant issued permitted sei-

zure of any document which was evidence of a violation of 18 U.S.C. § 1341, the generic mail fraud statute. 614 F.2d at 7. Thus on its face the warrant permitted seizure of any document related to a mail fraud offense and was not limited by the showing of probable cause made in the application and affidavit. The order in the instant case, by contrast, does not give agents authority to seize under the generic RICO and conspiracy statutes—it is specifically limited by inclusion of the predicate offense, violation of the Nevada Gaming Laws, in the authorization. The inclusion of the predicate

The particularity requirement of the warrant clause is also addressed by the statutory command to "minimize" interception of non-relevant conversations. *See* § 2518(5); *United States v. Clerkley,* 556 F.2d 709, 715 (4th Cir. 1977); *United States v. DePalma,* 461 F.Supp. 800, 817 (S.D.N.Y. 1978); *United States v. Focarile,* 340 F.Supp. 1033, 1044 (D.Md.), *aff'd sub nom, United States v. Giordano,* 469 F.2d 522 (4th Cir. 1972) *aff'd* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). A directive to minimize was included in each order. *See e.g.,* 1 App. I, Order of Jan. 29 at 8. Defendants attack the language used by Agent Wacks in describing the minimization procedures which the monitoring agents were to follow:

> Normal minimization procedures will be adhered to during this interception period, to-wit: monitoring of conversations being intercepted on the previously identified telephone lines will immediately terminate when it is determined through voice identification or otherwise that none of the aforementioned principals are participants in the conversation, or the conversation is not criminal in nature.

1 App. I, Affidavit of Agent Peter Wacks at 66.

There is considerable doubt whether any minimization directive is required in the order under the statute or Constitution. *See United States v. Vento,* 533 F.2d 838, 860–61 (3d Cir. 1976); *United States v. Cirillo,* 499 F.2d 872, 879–90 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974) (interpreting identical New York statute); *United States v. Rizzo,* 492 F.2d 443, 446–47 (2d Cir.), *cert. denied,* 417 U.S. 944, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974); *United States v. Manfredi,* 488 F.2d 588, 598–601 (2d Cir. 1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974).[46] It is highly doubtful whether an overbroad statement by the affiant could vitiate an otherwise valid warrant if the actual conduct of the monitoring agents comported with the statutory command to minimize the interception of unrelated conversations. *See generally Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). But assuming, arguendo, that a minimization directive in the order is required, and the statement of the affiant as to minimization procedures is material, the procedure outlined by Agent Wacks offends neither the Constitution nor the wiretap statute.

Defendants analogize the minimization order (assuming it incorporated the accompanying affidavit) to warrants which have been held invalid because they authorized seizure of physical evidence unrelated to the crime alleged. *See United States v. Abrams,* 615 F.2d 541 (1st Cir. 1980); *In re the Application of LaFayette Academy,* 610 F.2d 1 (1st Cir. 1979). Those cases are inapposite in two crucial respects. Insofar as the analogy to seizure of physical evidence is appropriate, the minimization procedure stated is akin to warrants which permit the officer to examine physical evidence at the scene to determine which items

offense, or a description of the alleged conspiracy in the order itself, is enough to meet the particularity requirement. *See Andresen,* 427 U.S. at 480–81, 96 S.Ct. at 2748–49; *see also United States v. Jacob,* 657 F.2d at 50–52; *United States v. Bithoney,* 631 F.2d at 2–3; *United States v. Loften,* 518 F.Supp. at 844.

46. Cases which hold that a minimization directive in the order is not essential rely on specification of the persons involved and the nature of the offense to meet the particularity requirements of the fourth amendment. *See* § 2518(4)(a)–(c). As the Third Circuit stated in *Vento*

> [T]he minimization clause would appear to be a "less crucial" requirement of Title III.

The minimization proviso of section 2518(5) complements the specific requirements of section 2518(4), but it is section 2518(4) that gives "significant directions to law enforcement officials as to how reasonable interception will be minimized." The failure to include the minimization phrase when the basic guidelines have been supplied and where there exists a means of measuring compliance with the minimization provisions of the statute cannot be said to be fatal.

533 F.2d at 861. The focus on the conduct of the surveillance, rather than the affiant's statement of procedures, would appear to be consistent with the approach taken by the Supreme Court in *Scott. See* section VII–B, *infra.*

are covered by an otherwise valid warrant. In *Abrams,* the court recognized that on-site inspection to determine which documents were covered by the warrant is essential if the warrant is to be carried out at all. 615 F.2d at 545. The Supreme Court commented in *Andresen*:

> We recognize that there are dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable. In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized. *Similar dangers, of course, are present in executing a warrant for the "seizure" of telephone conversations.*

427 U.S. 463, 482 n. 11, 96 S.Ct. 2737, 2749 n.11, 49 L.Ed.2d 627 (1976). (emphasis supplied)

The minimization procedure outlined by Agent Wacks does not authorize the monitoring agents to "seize" all conversations over the stated telephone lines and determine at a later time which conversations are covered by the warrant. Rather, it is the listening equivalent of permitting on-site inspection of documents or other physical evidence to determine if such evidence falls within the scope of the warrant. Courts dealing with electronic surveillance have uniformly recognized that the amount of flexibility provided by similar minimization directives is necessary given the realities of electronic surveillance. *See Scott v. United States,* 436 U.S. at 139–42, 96 S.Ct. at 1724–25; *see also United States v. Hyde,* 574 F.2d 856, 869 (5th Cir. 1978); *United States v. Daly,* 535 F.2d 434, 441 (8th Cir. 1976); *United States v. Quintana,* 508 F.2d 867, 873–75 (7th Cir. 1975); *United States*

*v. Bynum,* 485 F.2d 490, 500 (2d Cir. 1973), *vacated on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 409 (1974); *United States v. Cox,* 462 F.2d 1293, 1301 (8th Cir. 1972). As the court stated in *Daly,* "[w]e recognize that monitoring agents are not gifted with prescience." 535 F.2d at 441. Conversations, unlike physical evidence, do not have a form or appearance readily apparent to the listener; thus, to deny the monitoring agent permission to listen until it can be determined whether a particular conversation is related to the authorized objective under the order is to render Title III totally ineffective. We decline to order such a result.

 What we have said does not mean, of course, that monitoring agents are free to listen to all conversations. It means simply that a warrant affording them the opportunity to determine if conversations are covered within the scope of the authorized objective is not invalid. Whether the conduct of the monitoring agents adequately respected the privacy rights of the speakers and obeyed the statutory command to minimize interception of non-pertinent calls is a question of fact to be determined on a case by case basis. *See Scott v. United States,* 436 U.S. at 139–40, 98 S.Ct. at 1724. It is that question to which we now turn.

B

Defendants attack the conduct of the electronic surveillance involved in this case under the initial order of January 29, 1979, and extensions issued on March 1, March 30 and April 28,[47] as well as the order expanding the surveillance on April 7. They contend that the government, through the monitoring FBI agents, violated the minimization provisions of the orders and the requirement of Title III by listening to conversations not covered by the orders issued by Chief Judge Parsons.[48]

---

47. As stated earlier, the surveillance of Dorfman and others continued for fourteen months. Defendants have challenged only the conduct under the original authorization and first three extensions. Our examination, therefore, is restricted to the conduct of the surveillance for the period from February through May, 1979.

48. The statute provides, § 2518(5),
 ... [e]very order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception under this chapter, and must terminate upon attainment of the

The term minimization is a shorthand expression which represents the government's obligation to reduce to the extent possible interception of conversations which are not the subject of the court order. Minimization is to be judged on a case by case analysis of the reasonableness of the government's conduct in terminating non-pertinent conversations. *Scott v. United States*, 436 U.S. 128, 139–40, 98 S.Ct. 1717, 1724–25, 56 L.Ed.2d 168 (1978). *See also United States v. Feldman*, 606 F.2d 673, 677–79 (6th Cir. 1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1648, 64 L.Ed.2d 236 (1980); *United States v. Hyde*, 574 F.2d 856, 869–70 (5th Cir. 1978); *United States v. Abascal*, 564 F.2d 821, 826–27 (8th Cir. 1977), *cert. denied*, 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538 (1978); *United States v. Clerkley*, 556 F.2d 709, 716–18 (4th Cir. 1977), *cert. denied*, 436 U.S. 930, 98 S.Ct. 2830, 56 L.Ed.2d 775 (1978); *United States v. Chavez*, 533 F.2d 491, 492–93 (9th Cir. 1976), *cert. denied*, 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1977); *United States v. Armocida*, 515 F.2d 29, 42–46 (3d Cir. 1975), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *United States v. Quintana*, 508 F.2d 867, 873–76 (7th Cir. 1975).[49] The reasonableness approach reconciles the frequently difficult task of determining the character of an intercepted conversation with the statutory policy of minimizing any intrusion on personal privacy. *See* S.Rep. 1097, supra p. 31 at 27, 2112. It must be remembered that "[t]he statute does not forbid the interception of all non-relevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott v. United States*, 436 U.S. at 140, 98 S.Ct. at 1724. Absent an "unreasonable" intrusion, neither the statute nor the fourth amendment are violated. *Id.* at 138–39, 98 S.Ct. at 1723–24. *See also United States v. Quintana*, 508 F.2d at 873–74; *United States v. James*, 494 F.2d 1007, 1018 (D.C.Cir.1974).

Whether the government agents acted reasonably in a given case is affected by a number of factors, including the nature and scope of an alleged conspiracy, the government's reasonable expectation of the character of the conversations they will be intercepting, and the extent of ongoing judicial supervision over the surveillance. *See United States v. Hyde*, 574 F.2d at 870; *United States v. Clerkley*, 556 F.2d at 716; *United States v. Vento*, 533 F.2d 838, 851–52 (3d Cir. 1976); *United States v. Daly*, 535 F.2d 434, 441 (8th Cir. 1976); *United States v. Armocida*, 515 F.2d at 44. Of particular importance to this case is the recognition that,

> Large and sophisticated [ ] conspiracies may justify considerably more interception than would a single criminal episode. This is especially so where, as here, the judicially approved purpose of the wiretap is not so much to incriminate the known person whose phone is tapped as to learn the identity of the far-flung conspirators and delineate the contours of the conspiracy.

*United States v. Quintana*, 508 F.2d at 874.

At the early stages of the investigation agents have greater leeway to monitor, especially where all the parties to the alleged conspiracy are not known in advance.[50] *Hyde*, 574 F.2d at 870; *Chavez*,

---

authorized objective, or in any event in thirty days.

**49.** Defendants spent a considerable amount of time at the hearing on the minimization issue questioning monitoring agents and their supervisors on what they intended to listen to during the course of the surveillance and how they interpreted the scope of the authorized objective. Putting aside the problem that what one "intends" to listen to is a rather metaphysical concept, the Supreme Court in *Scott* clearly indicated that subjective intent is not the issue in a minimization inquiry. 436 U.S. at 135–39 & n.11, 98 S.Ct. at 1722–24 & n.11. Like traditional fourth amendment law, where an improper subjective intent cannot defeat a search that is otherwise lawful, *see United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), the statute in question here directs us to the conduct of the "search", not the motivation of the officers. *Scott*, 436 U.S. at 139, 98 S.Ct. at 1724.

**50.** The order in the instant case permitted interception of certain named individuals and "others as yet unknown." 1 App. I, Order of

533 F.2d at 494; *Quintana,* 508 F.2d at 874. It is not enough for the defendants to identify particular calls which they contend should not have been intercepted; they must establish a pattern of interception of innocent conversations which developed over the period of the wiretap.

> * * * the only feasible approach to minimization is the gradual development, during the execution of a particular wiretap order, of categories of calls which most likely will not produce information relevant to the investigation. Once the monitoring agents have sufficient data to conclude that a particular type of conversation is unrelated to the criminal investigation, the minimization requirement obliges them to avoid intercepting future conversation as soon as they can determine that it falls within that category.

*United States v. Hyde,* 574 F.2d at 870 (*quoting United States v. Scott,* 516 F.2d 751, 754 (D.C.Cir.1975), *cert. denied,* 425 U.S. 917, 96 S.Ct. 1519, 47 L.Ed.2d 768 (1976)). *See also United States v. Chavez,* 533 F.2d at 495.

▆▆▆ In the instant case the government had substantial advance expectation as to the character of the calls—its agents knew the location where the wiretap was being conducted was a legitimate business with well over one hundred employees. *See* Defendants' Ex. D at 3–7. Moreover, because of the nature of the phone system at Amalgamated, it was impossible to isolate the lines to be used by the particular subjects of the interception. Thus, this case is fundamentally different from cases where the sole expected use of the tapped telephone was for the illegal enterprise and therefore a policy of total interception, at least initially, was not unreasonable. *See e.g., United States v. Quintana,* 508 F.2d at 874. In this case, the obligation to minimize was substantially greater at the outset, *id.; United States v. James,* 494 F.2d at 1020.

▆▆▆ The evidence adduced at the hearing on minimization demonstrates that the government met its obligation to establish procedures to comply with the minimization requirement. The monitoring agents testified that prior to commencement of the interception a conference was held at which minimization instructions were given by chief of the Chicago strike force office of the Department of Justice, Douglas P. Roller. T. 113–119, 278–289.[51] In addition the monitoring agents were provided with a copy of the court order, Defendants' Exhib-

January 29 at 7. It is well settled that authorizing interception of "others as yet unknown" is permissible under the statute so long as the representation made in the affidavit is made in good faith. *See United States v. Kahn,* 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974); *see also United States v. Baker,* 589 F.2d 1008, 1011 (9th Cir. 1979); *Quintana,* 508 F.2d at 873 n. 5.

Defendants argue, however, that the affidavit submitted in this case contained a promise that the monitoring agents would discontinue listening when it was determined that none of the named interceptees was a speaker. *See* 1 App. I, Wacks Aff. at 66. Thus, they argue, any conversation intercepted between persons not named in the order violated the "promise" made to Judge Parsons about the minimization procedures which would be followed in this case. This position is directly contrary to an argument also made by defendants, based on precisely the same language in the affidavit, that the order was unconstitutionally overbroad. We have already indicated our doubt whether the affiant's language on this subject is material. *See* pp. 388–389, *supra.* Nevertheless, we do not share defendants' restrictive reading of the affidavit. The affidavit indicates that "Normal minimization procedures will be adhered to"; it would be highly abnormal, as we read the cases, to restrict monitoring entirely to named interceptees when one of the major purposes of the investigation is to determine what other unknown persons are participating in the conspiracy. Rather, the agents must comport with the procedures outlined above in identifying those calls and individuals who are not subject to interception. In short, we believe the minimization directive in this case parallels that which is required by the statute and does not require that a more restrictive procedure be employed.

51. Defendants' Exhibit B is a memo prepared by agent Arthur Pfizenmeyer in preparation for the January 25 meeting prior to the commencement of the surveillance and indicates, in accord with testimony, that the subject of minimization was to be addressed at the meeting by Mr. Roller.

it E, and a memorandum from the strike force attorneys outlining the procedures to be followed during the investigation, including minimization, Defendants' Exhibit A, as well as a list of employees at Amalgamated for purposes of identification. Defendants' Exhibit D.[52] *See id.* In addition, substantial ongoing judicial supervision was ordered by Chief Judge Parsons in the form of five day reports to the court which included copies of the logs indicating the volume of calls and the number intercepted. While the logs are too voluminous to expect the supervising judge to review them in detail, a cursory glance at the reports indicates the volume of calls coming over the lines and the number deemed pertinent by the monitoring agent.[53] Defendants' Exhibit 18A–E, 19A–E, 20A–B.

The results of the efforts to inform the monitoring agents of the need to observe minimization procedures are reflected in these statistics for the challenged period of the wiretap: In February approximately 72% of all calls were minimized, in March 70%, in April 77%, in May 73% and in June 76%. On the oral intercept, in April 77% of all conversations were minimized, in May 90% and 90% again in June.[54] *See* Govern-

ment Exhibit 8. These figures do not indicate, however, that all the remaining calls were not minimized. As the government correctly pointed out in its argument, and the Supreme Court recognized in *Scott*, a substantial percentage of calls are not subject to minimization because they are simply too short, the participants are not identified prior to termination or the subject matter simply cannot be determined.[55] *See Scott*, 436 U.S. at 140, 98 S.Ct. at 1724.

Defendants attempt to denigrate the importance of these figures by pointing out that Amalgamated is an insurance agency with a high volume of claims calls which the government knew from the outset were not pertinent. T. 773–780. While the gloss urged by defendants is undoubtedly true, it does not reduce the significance of the statistical evidence. The government's obligation is to do precisely what the evidence indicated it did—minimize the interception of calls which do not concern the authorized objective. That such minimization is made easier by the fact that certain types of calls clearly fall outside the scope of the order hardly controverts the evidence presented by the government that good faith efforts

---

52. The first two pages of Defendants' Exhibit D, the list provided to the monitoring agents, contains names other than Amalgamated employees and indicates the "following individuals may be intercepted" over the phones. Defendants contend that the list demonstrates that the FBI intended to intercept individuals who were not subject to this investigation. The agents testified, however, that the list was provided to acquaint them with the names of people whose voices they might be hearing for ease in the identification process. The list contains the names of the subjects of the investigation as well as individuals not named in the January 29 order and includes names that would indeed be difficult to identify as well as others that are quite simple. The purpose of the list is ambiguous and we prefer to judge interception of the individuals named on the list by the standard minimization requirements rather than attempting to assign a motive to the FBI in presenting the agents in the field with a list of names.

53. Any call deemed pertinent by the monitoring agent was contemporaneously marked with a large red asterisk next to the log entry describing that call.

54. The minimization procedures employed for the oral interception were substantially different and more restrictive than that used for the telephone monitoring. *See* Defendants' Exhibit J at 2–2B. As we understand defendants' argument, they do not make a separate attack on the conduct of the oral intercepts, and thus our discussion focuses primarily on evidence of the conduct of the wiretaps.

55. In *Scott*, virtually all of the calls over the tapped phone were intercepted while only 40% were in actuality related to the authorized objective. The Court nevertheless found the conduct of the investigation "reasonable", relying in part on the fact that the percentage figures invariably over-estimate the amount of intercepts because of the factors cited above. 436 U.S. 132, 140, 98 S.Ct. 1720, 1724. Thus, in the case at bar the 70 to 77 percent figures are, if anything, low. That conclusion is supported by our examination of the logs submitted into evidence. For example, there are dozens, probably hundreds of outgoing calls which reached busy signals; those attempts are recorded as "calls" but do not indicate they were minimized because conversation was never begun.

were made to reduce as much as possible the interception of irrelevant conversations.

 In addition to the generalized objection to the minimization procedures employed during this surveillance, defendants make two particularized minimization arguments: one, that there was a pattern of interception of high level employees at Amalgamated that was not related to the authorized objective, and two, that the interception of those properly named as interceptees in the January 29 and subsequent orders was overbroad.[56]

 As to the first argument, defendants have produced substantial evidence that the government continued to intercept the calls of certain Amalgamated employees even after it became clear from the initial stages of the electronic surveillance that those individuals were not parties to or at least never discussed over the Amalgamated phone lines, the alleged conspiracy which triggered the January 29 order.[57] The evidence demonstrates that the monitoring agents intercepted a substantial number of conversations involving individuals who were not subjects of the surveillance order concerning subject matters that, even on a liberal reading of the authorized objective in this case, had nothing to do with "hidden interests" in Las Vegas or Reno, Nevada casinos.[58] This unauthorized

---

**56.** There are serious standing problems with at least some of the conversations which defendants seek to have suppressed as a result of the alleged minimization violation. As we have indicated previously, see n. 6, supra, Title III only permits an "aggrieved person" to suppress evidence. See § 2518(10). The meaning of "aggrieved person" has been held to be consistent with the standing requirements of fourth amendment jurisprudence. Alderman, 394 U.S. at 175 n. 9, 89 S.Ct. at 967 n. 9. Thus, in order to suppress a conversation which the government intends to use at trial a defendant must be a party to the conversation or the conversation must be intercepted on defendant's premises. Id. at 176–80, 89 S.Ct. at 968–970. Many of the calls which defendants contend were intercepted unlawfully involve only third persons. However, each defendant, with the exception of defendant Dorfman, was intercepted at least once prior to becoming an authorized interceptee, speaking to one of the employees who defendants contend were improperly monitored. Thus, if defendants made out their claimed minimization violation, some suppression could result.

Moreover, defendant Dorfman apparently has a proprietary interest in Amalgamated. It is undisputed that Amalgamated's phones were tapped solely as a method of intercepting his conversations and those people working with him who might be involved in the authorized objective. Thus, at least one of the defendants has standing to object to the conduct of the surveillance as a whole and it is appropriate, therefore, that we consider the general minimization claims. See Scott, 436 U.S. at 135–36 n. 10, 98 S.Ct. at 1722–23 n. 10.

**57.** The particular employees identified by defendants in argument are David Dorfman, Bill Webbe, Mike Breen, Marty Wolfinsohn, Blaine Williams, Jim Dorfman, Jay Dorfman and Barney Baker and "scores of others" who are not identified. T. at 2056. We have focused, in our factual review, on the individuals named by defendants.

**58.** In urging this conclusion defendants rely on the difference between the number of calls identified in Government's Exhibit 8 as "pertinent" intercepts and the number of calls submitted to Chief Judge Parsons as "related" to the authorized objective. See T. 686–708, 729–731, 748–757. While the differential in numbers is substantial, we do not think it is dispositive of the minimization inquiry. The decision whether a particular call is pertinent must be made by the monitoring agent during the course of the call without benefit of hindsight or a review of completed transcripts. The decision whether to submit a particular call as supportive of probable cause for continuing the surveillance was made by the supervising agents and attorneys upon reflection that included not only the agents' logs, but duplicate cassettes of each call and typed summaries of their content. It is not surprising that a substantial weeding out would take place before the ultimate decision of which conversations should be pointed out to the supervising judge as particularly relevant.

What nevertheless persuades us that a pattern of unauthorized overhears with respect to certain Amalgamated employees is present in this case is a review of the summaries contained in Government's Exhibit 11 and Defendants' Exhibits 100 and 101. Those exhibits, consisting of several hundred pages, contain short descriptions of the conversations which were intercepted in full and deemed to be "relevant" to the authorized objective. The summaries were prepared within a very short time after interception and elaborate, with varying degrees of detail, the topic of the conversation. It would not be productive to describe here the contents of those conversations; it suffices to say that many involve individuals not named as

interception not only occurred during the initial stages of the surveillance, where substantially more latitude is permitted, but continued into March, April and succeeding months. However, despite our agreement with defendants that unauthorized interception took place during this surveillance, we disagree with their conclusions about the scope of the minimization inquiry and the remedy that is required where a minimization violation is established.

 Defendants argue that because the scope of an order was exceeded, all of the evidence obtained by virtue of the order must be suppressed. That conclusion runs contrary to both the language of the statute and the case law dealing with suppression of unlawfully executed warrants in this and other areas of fourth amendment jurisprudence. See Sec. IV, n. 30 supra. In order to suppress a conversation which the government intends to introduce at trial, defendants must establish that interception of that conversation was unlawful. Suppression of lawfully intercepted conversations does not follow where all that is established is that the government also intercepted other conversations unlawfully. See United States v. Principie, 531 F.2d 1132, 1140–41 (2d Cir. 1976), cert. denied, 430 U.S. 905, 97 S.Ct. 1173, 51 L.Ed.2d 581 (1977); United States v. Cox, 462 F.2d 1293, 1301 (8th Cir. 1972), cert. denied, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974); United States v. Webster, 473 F.Supp. 586, 598 (D.Md.1979), aff'd in relevant part, 639 F.2d 174 (4th Cir. 1981); United States v. Pine, 473 F.Supp. 349, 356 (D.Md.1979); United States v. Sisca, 361 F.Supp. 735, 744–45 (S.D.N.Y.1973), aff'd, 503 F.2d 1337 (2d Cir.), cert. denied, 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974); United States v.

LaGorga, 336 F.Supp. 190, 197 (W.D.Pa. 1971); United States v. King, 335 F.Supp. 523, 544–45 (S.D.Cal.1971), rev'd on other grounds, 478 F.2d 494 (9th Cir. 1973), cert. denied, 417 U.S. 920, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).

 Congress, in fashioning the exclusionary rule to be followed under Title III, directed attention to the particular conversations sought to be suppressed:

Any aggrieved person ... may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—

(i) the communication was unlawfully intercepted

\* \* \* \* \* \*

(iii) the interception was not made in conformity with the order of authorization or approval.

§ 2518(1)(a) (emphasis supplied). Moreover, the general section prohibiting the use of unlawfully obtained evidence in any trial specifically refers to "such communication" and gives no indication that exclusion is supposed to be used as a punitive measure to prohibit the introduction of lawfully intercepted conversations. Accord, United States v. Cox, 462 F.2d at 1301; United States v. LaGorga, 336 F.Supp. at 196; United States v. King, 335 F.Supp. at 535. The Supreme Court in Scott, while reserving the specific question decided here, see 436 U.S. at 135–36 n. 10, 98 S.Ct. at 1722–23, n. 10, recognized that "§ 2515 was not intended 'generally to press the scope of the suppression role beyond present search and seizure law.' S.Rep. 1097, 90th Cong. 2d Sess., 96 (1968)." 436 U.S. at 139.[59]

interceptees speaking about topics unrelated to the authorized objective. Given the fact that the summaries generally identify the speakers and highlight what in the conversation caught the attention of the monitors, there is no question of applying "hindsight" to determine the relevancy of the conversations to the authorized objective—the summaries identify the topic of conversation and time and again they have nothing whatsoever to do with the authorized objective of the surveillance. See, e.g., Defend-

ants' Exhibits 57, 58, 59, 65 (consisting of transcripts and summaries of conversations used by defendants as examples of their minimization argument).

**59.** There is a suggestion in certain cases by way of dicta that the more severe sanction of total suppression is permissible, if not required, where the evidence suggests the monitoring agents totally disregarded the statute and applicable order by simply listening to everything and making no effort to minimize. See United

 A contrary position was taken by the district court in *United States v. Focarile*, 340 F.Supp. 1033, 1046–47 (D.Md.), *aff'd on other grounds sub nom. United States v. Giordano*, 469 F.2d 522 (4th Cir. 1972), *rev'd*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), where Judge Miller indicated total suppression would be the remedy if a minimization violation were found.

Knowing that only "innocent" calls would be suppressed the government could intercept every conversation during the entire period of a wiretap with nothing to lose by doing so since it would use at trial only those conversations which had a definite incriminating value anyway, thereby completely ignoring the minimization mandate of Title III.

*See also United States v. Scott*, 331 F.Supp. 233, 246–49 (D.D.C.1971), *rev'd*, 504 F.2d 194 (D.C.Cir.1974).[60] In our opinion *Focarile* misconstrues the nature of the minimization inquiry. We do not simply focus on the individual conversation and determine whether it contains any incriminating statements; rather, where a pattern of unlawful

interception is established we examine the challenged interceptions to determine whether they fall within that pattern. If the government continues to intercept, for example, a person not named in the authorizing order after his or her identity has been established and a pattern of innocent conversation takes place, it would be of no moment that eventually that individual was heard discussing incriminating matter; the conversation would still be subject to suppression because it would have been "unlawful" for the monitors to be overhearing the conversation in the first instance. It is not true, therefore, that anything short of total suppression renders the minimization requirement a nullity. Accordingly, we must determine whether any of the conversations the government intends to use at trial fall within the pattern of improper interception we have identified above.

 Almost all of the challenged conversations of persons not named in the original order involve one of two Amalgamated employees: William Webbe or David Dorfman.[61] *See* List of Conversations

States v. Principie, 531 F.2d at 1140 (dicta); United States v. Turner, 528 F.2d 143, 156 (9th Cir.), cert. denied, 423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975). We doubt whether that suggestion survives the statement to the contrary in Scott and the weight of authority cited above, but, regardless of the status of the remedy in the face of a total disregard of the minimization command, that issue does not confront us here. The evidence reviewed in the first part of our discussion on minimization indicates that substantial efforts were made to limit the interception in this case. That those efforts were inadequate in certain respects in no way indicates that the conduct of the surveillance here should be equated with surveillance in other cases where minimization procedures were ignored entirely. See Scott, 331 F.Supp. 233, 246–49 (D.D.C.1971), rev'd, 504 F.2d 194 (D.C.Cir.1974).

**60.** The Scott case had a tortured path through the courts. The original opinion, cited above, was reversed and remanded. On remand the district court again ordered the evidence suppressed and the court of appeals again reversed, see United States v. Scott, 516 F.2d 751 (D.C.Cir.1975), this time taking matters into its own hands and determining that the evidence should not be suppressed. After a bench trial on the merits defendant was convicted, the court of appeals affirmed, see 551 F.2d 467

(D.C.Cir.1977) and the Supreme Court granted certiorari and addressed the minimization question as discussed *supra*.

**61.** On defendants' entire list of conversations they seek to have suppressed there are only three conversations not involving a named interceptee, Webbe or David Dorfman, which have any relationship to the case to be tried here or the applications for extensions. They are a February 1 call between Jim Kalil and Marty Wolfinsohn, a February 16 call between a "Mr. Talbot" and UF (unidentified female), and an April 10 call between Mike Breen and Louis Peick.

We deal with the circumstances of the Kalil-Wolfinsohn call at note 63, *infra*. As to the call involving Mr. Talbot, regardless of its content, as we understand it he is not an Amalgamated employee and no evidence has been presented that interception of his calls to an unidentified person in February falls within any unlawful pattern of interception except the general failure to minimize argument which we have rejected above. On March 30, however, Ed Talbot is named as an authorized interceptee and therefore the interception of his April 6 call, given its length of time (one minute) and the fact that the call was placed to speak to another authorized interceptee (Sol Schwartz), was lawful. See Government's Exhibit 11, NDI 168, 9:34 (April 6, 1979).

Which Defendants O'Malley and Massa Seek To Have Suppressed As A Result Of The Government's Violation Of The Minimization Provisions Contained In The January 29 [and subsequent] Court Orders.[62]

We have examined the log entries and summaries of calls involving Webbe and David Dorfman and find that, whatever the merits of defendants claim as to other employees, interception of their conversations was not unlawful. On the very first day of the surveillance Webbe was intercepted discussing with Allen Dorfman and others the need to arrange a meeting to have certain undescribed "bids" withdrawn. On the second day of the wiretap he was overheard again discussing bids on property and Dorfman's role in pressuring other bidders to walk away. We have already described in detail why it was justifiable for the supervising agents and attorneys to construe these calls as related to the authorized objective. *See* Part IV, *supra.* A monitoring agent, informed of the nature of this investigation who on the first and second days of interception picks up an employee discussing in veiled terms "bids" and shortly thereafter learns that they are with reference to property in Las Vegas clearly has reason to continue monitoring the calls of that employee; to do any less would be to fail in his job.

Once Webbe was properly implicated as "an other as yet unknown" conspirator, a policy of increased attention to his calls was clearly permitted under the law. The government had an obligation in any subsequent application to include Webbe as a named interceptee. *See United States v. Donovan,* 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977) (government required to name all those for whom it has probable cause on the offense in question); *but cf. id.* (failure to name does not require suppression). It did so here, when on March 1 Webbe was properly named as an interceptee for the alleged Nevada gaming act violations. *See* Sec. IV, *supra.* The interception of Webbe subsequent to March 1 was clearly differentiated from the interception of other Amalgamated employees and was entirely proper.

The same is true with respect to David Dorfman. On January 31, the second day of interception, and again on February 1, he was intercepted discussing a plan to refi-

The Breen-Peick call, however, despite its arguable relevance to the case before us here, does fall within the pattern shown by defendants and therefore should be suppressed. The government had intercepted Breen countless times prior to April 6, he was never named as an authorized interceptee in the January order or the March extensions and he was speaking in this conversation to another unnamed person. The call in question was four and one-half minutes long. Under our view of the minimization obligation the interception of this call should have been terminated upon identification of the parties; because it falls under a pattern of unauthorized interception of Breen and other identified Amalgamated employees the interception was unlawful. However, since none of the defendants was a party to the conversation and only defendant Dorfman has a proprietary interest in the telephones tapped, only defendant Dorfman has standing to have the conversation suppressed. *See* n. 6 and 54, *supra.*

We note that it is unclear if the government intends to use this conversation for anything but impeachment purposes. Title III does not prohibit its use solely for impeachment purposes even though the conversation was unlawfully intercepted. *United States v. Winter,*

663 F.2d 1120, 1154 (1st Cir. 1981), *petition for cert. filed,* 50 U.S.L.W. 3607 (U.S. Jan. 22, 1982) (No. 81–1392); *Jacks v. Duckworth,* 651 F.2d 480, 484 (7th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1010, 71 L.Ed.2d 300 (1982); *United States v. Farese,* 611 F.2d 67, 70–71 (5th Cir. 1980); *United States v. Caron,* 474 F.2d 506, 508–10 (5th Cir. 1973); *See* S.Rep. 1097, *supra* p. 31, at 91, 2184–85. *See also United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980); *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954).

62. While the "List" was submitted by the two defendants whose names appear thereon, it was joined by all other defendants. No other request to suppress specific conversations pursuant to the claimed minimization violation has been received and we therefore restrict our discussion to the conversations which have been called to our attention. We add for clarification that there are two lists with the same title, one docketed March 26 and the other April 6. *See* 81 CR 269–5. The second list is more extensive and we therefore refer to it.

nance the Aladdin and Landmark casinos. See Part IV, *supra.* Without repeating the nature of those calls, already contained in our discussion of probable cause for the March 1 extension, it suffices to point out that on any reading of the January 29 order those calls were clearly related to the authorized objective. The same procedure of subsequently identifying David Dorfman as another as yet unknown conspirator on March 1 was followed and the continued monitoring of his calls was proper.

In sum, even though defendants have established improper interception of some Amalgamated employees, we hold that the interceptions of the conversations of Webbe and David Dorfman of which defendants complain were not within the pattern of unlawful interceptions and thus suppression is not contemplated by the statute or required by the Constitution.[63]

Defendants' final contention for finding a minimization violation is that the named interceptees—while properly subject to surveillance—were over-intercepted.[64] We have already observed that the monitoring agents must be afforded substantial leeway in intercepting the calls of authorized interceptees if they are to be permitted a reasonable possibility of achieving the authorized objective of the surveillance; this is even more clear where the conversation in question, like many which defendants seek to suppress, is between two authorized interceptees, either alone or with third parties. When examined with these standards in mind we find that defendants have failed to establish a case for a minimization violation with respect to the authorized interceptees. Our review of the logs submitted as part of Defendants Exhibits 18A–E, 19A–E, 20A–B, and K, along with the pertinent intercepts contained in Government Exhibit 11 and Defendants' Exhibits 100 and 101 fails to reveal the type of pattern of overinterception that we have identified with respect to employees of Amalgamated not named in the orders.[65]

---

**63.** The remaining interception of which defendants complain is the Kalil-Wolfinsohn conversation of February 1. See Defendants' Exhibit 42. This call was not intercepted unlawfully and therefore we reject the argument that it should be stricken from our consideration of the probable cause issue on March 30, where the call was utilized. (The conversation is not at issue for the trial on the merits of the case at bar). While we have agreed with defendants that a pattern of interception not authorized by the warrant developed, the interception of this call at the outset of the surveillance does not fall within such a pattern. The case law is clear that leeway must be given before patterns of innocent conversation can be developed. *United States v. Hyde,* 574 F.2d at 870; *United States v. Chavez,* 533 F.2d at 492; *United States v. Quintana,* 508 F.2d at 873–75. At the time this conversation was intercepted, before any pattern could have developed, its interception was not unlawful.

Moreover, the content of the call contains specific references to kickbacks on insurance policies. See Defendants' Exhibit 42 at 9–15. Where agents are properly monitoring a call which turns to criminal activity not covered by the order, they are permitted to continue the interception.

**64.** The conversations which defendants seek to suppress on this ground are contained in the same "List of Conversations ..." referred to *supra* under the heading "Other Conversations Improperly Monitored". All of the conversa-

tions involve Allen Dorfman and thirteen of the total of seventeen also include at least one other named interceptee.

**65.** Defendants' Exhibit K is a selected group of logs from the oral interception in Dorfman's office conducted pursuant to the April 7 order. We find that evidence particularly persuasive for the government on the issue of whether the agents adequately minimized the conversations of Allen Dorfman. The number of conversations which were minimized when it was determined the content of the conversations was unrelated to the authorized objective belies defendants' claim that the authorization was used as a general warrant against Dorfman. The logs reflect a random sampling of Dorfman's office conversations which are continually terminated when the subject matter of the discussion is identified as not pertinent. See T. 337–343, 352–358. Defendants have suggested no other or better way to minimize where oral interception is authorized and we can conceive of none:

Under these circumstances we find that the government has made a *prima facie* showing of reasonableness, and that the burden is shifted to the defendants to suggest what alternative procedure would have better minimized interception of noncriminal conversation while still permitting the government to achieve its legitimate objectives.

*United States v. Quintana,* 508 F.2d at 875 (citing *United States v. Manfredi,* 488 F.2d 588,

Like Webbe and David Dorfman, Allen Dorfman was intercepted at the very inception of the surveillance discussing matters related to the authorized objective. While defendants may point to particular conversations which, with hindsight, we might agree should not have been intercepted, the efforts taken to minimize such interception with respect to the named interceptees complied with the standards established under § 2518(5).[66] We conclude, therefore, that their interception was not pursuant to any unlawful pattern and the motion to suppress those conversations on minimization grounds should be denied.

## C

Title III requires that before electronic surveillance is instituted a showing of "necessity" must be made. The Supreme Court stated in *Giordano*,

> [Electronic surveillance is] not to be routinely employed as the initial step in a criminal investigation. Rather, the applicant must state and the court must find that normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.

416 U.S. at 515, 94 S.Ct. at 1826.[67] *See* § 2518(1)(c) and (3)(c). *See also United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974). The legislative history illuminates the showing that is required under the statute:

> Subparagraph (c) requires a full and complete statement as to whether or not normal investigative procedures have been tried and have failed or why these are

unlikely to succeed if tried, or to be too dangerous .... Normal investigative procedures would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants. Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. [Citations omitted]. What the provision envisions is that the showing be tested in a practical and commonsense fashion.

S.Rep. 1097, p. 31 *supra* at 101, 2190.

The case law on the type of showing necessary to meet the requirements of § 2518(1)(c) is abundant. See *United States v. Almonte*, 594 F.2d 261, 264 (5th Cir. 1978); *United States v. Martinez*, 588 F.2d 1227, 1232 (9th Cir. 1978); *United States v. Gerardi*, 586 F.2d 896, 897–98 (1st Cir. 1978); *United States v. Williams*, 580 F.2d 578, 587–90 (D.C.Cir.), *cert. denied*, 439 U.S. 832, 99 S.Ct. 112, 58 L.Ed.2d 127 (1978); *United States v. Landmesser*, 553 F.2d 17, 19–21 (6th Cir.), *cert. denied*, 434 U.S. 855, 98 S.Ct. 174, 54 L.Ed.2d 126 (1977); *United States v. Spagnuolo*, 549 F.2d 705, 709–11 (9th Cir. 1977); *United States v. Lawson*, 545 F.2d 557, 563 (7th Cir. 1975); *United States v. Anderson*, 542 F.2d 428, 431–32 (7th Cir. 1976); *United States v. Kalustian*, 529 F.2d 585, 589–90 (9th Cir. 1976); *United States v. DiMuro*, 540 F.2d 503, 510–11 (1st Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977).

599–600 (2d Cir. 1973) *cert. denied*, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974)). Defendants have not met that burden. We note additionally that since the very outset of this prosecution defendants have had the actual tapes along with the logs and there has never been any suggestion made to the court that the logs reflecting termination of interception, on either the wire or oral microphones, are inaccurate.

**66.** In fact, the only conversations presented to us by defendants in the form of transcripts which involve defendant Dorfman are pertinent to the authorized objective under the Aladdin linkage theory which we accept in Part IV,

*supra*. *See* Defendants' Exhibits 81, 82, 85. Nothing other than the group exhibits referred to above has been submitted to demonstrate an unlawful pattern with respect to named interceptees in general and Allen Dorfman in particular.

**67.** The exact language of the statute requires that each application contain

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous. § 2518(1).

The court of appeals for this circuit has held "that 'the government's burden of establishing its compliance with [subsection 2518(1)(c)] is not great.'" *United States v. Anderson,* 542 F.2d at 431 (quoting *United States v. Askins,* 351 F.Supp. 408, 414 (D.Md.1972)). The statute does not require that wiretapping be used only as a last resort, *see United States v. Landmesser,* 553 F.2d at 20, nor is its purpose to foreclose the use of electronic surveillance until all other methods of investigation have been tried unsuccessfully, *id.*

> To support a finding that normal investigative procedures are unlikely to be successful, we interpret the congressional directions as only requiring that there exist a factual predicate in the affidavit.

*United States v. Anderson,* 542 F.2d at 431 (quoting *United States v. Armocida,* 515 F.2d 29, 38 (3d Cir. 1975)).

Defendants rely on cases indicating that mere boilerplate—conclusory allegations that might apply to all cases without reference to facts of the particular case—is insufficient. *See United States v. Kalustian,* 529 F.2d at 589–90. *See also United States v. DiMuro,* 540 F.2d at 510; *United States v. Kerrigan,* 514 F.2d 35, 38 (9th Cir. 1975) (per curiam). It is true that the allegations designed to meet the requirements of § 2518(1)(c) in Agent Wacks' affidavit are similar to those contained in many of the cases cited above. As is frequently the case the agent relied on essentially four factors in establishing the need for electronic surveillance: physical surveillance had been unsuccessful because the subjects of the investigation were surveillance conscious; confidential informants who provided information during the course of the investigation were unwilling to testify and grants of immunity were unlikely to persuade them to change their decision and would, in any event, violate assurances made to secure their cooperation; the affiant's experience and the nature of the case indicated the impossibility of introducing undercover agents into the ongoing conspiracy; and the use of traditional search warrants would be unproductive in light of the "nature of the investigative inquiry." *See* 1 App. I, Affidavit of January 29 at 67–69b.

Despite defendants' incredulity at the similarity between the assertions made here and those in other cases, it is hardly surprising that the factors necessitating electronic surveillance should be common to different cases. *See United States v. Almonte,* 594 F.2d at 264; *United States v. Gerardi,* 586 F.2d at 898; *United States v. DiMuro,* 540 F.2d at 510. What counts is whether the agent's assertions are supported by the facts in the affidavit and the nature of the investigation being conducted.

 On the facts of this case, we hold that the affidavit submitted by Agent Wacks was sufficient to make the showing required by § 2518(1)(c). The fact that physical surveillance of the subjects had been attempted and was unsuccessful is entitled to some weight in the determination. 1 App. I, Affidavit of January 29 at 64. *See United States v. Lawson,* 545 F.2d at 563. In light of the informant information previously described, the assertion that present informants were reluctant to become witnesses and would resist a grant of immunity is credible. Most importantly, the nature of the particular alleged offense, promotion and management of hidden interests in casinos between groups of individuals in three separate cities who, of necessity, conducted most of their business by telephone, supports the agent's assertion that the use of traditional investigative techniques would have been unrealistic.[68]

---

**68.** Defendants suggest that electronic surveillance could have been avoided, and the investigation itself rendered unnecessary, if the government had contacted the present owners of the casinos where Dorfman was alleged to have, or be attempting to acquire, a hidden interest. With all respect to counsel, it is ludicrous to suggest that in investigating alleged unlawful hidden interests in casinos the FBI has an obligation to confront those who might be participating in the scheme and ask them for an interview. Moreover, with respect to the particular casino in which Dorfman was allegedly attempting to purchase an interest, the government did interview the owner and his statement corroborated the informant information in several important respects. *See* 1 App.

Since the information known to date did not reveal the manner in which the alleged "skimming" was being carried out, the assertion that use of traditional search warrants would be unproductive is also supported by the facts of the particular case.

D

We are likewise unpersuaded by defendants' argument that the disclosure of prior surveillance made to Chief Judge Parsons was inadequate. The statute requires as part of the authorization process a statement of all previous applications involving the same parties or premises as the current application. *See* § 2518(1)(e).[69] The initial application and subsequent applications submitted to Chief Judge Parsons disclosed all prior surveillance of the interceptees named in the order, the name of the authorizing judge, the offenses under investigation and whether the application was approved. *See* 1 App. I, Wacks Aff. of January 29 at 8–26a; *id.*, Wacks Affidavit of March 1 at 9–31. Defendants contend that the disclosure was inadequate because it failed to detail the results of the prior interception. As another court stated in response to a similar argument, "[t]he short answer to this complaint is that the statute does not require what [defendants] say is

lacking." *United States v. Kilgore*, 518 F.2d 496, 500 (5th Cir. 1975). The statute only requires that the government detail applications that had some relationship to the parties or premises covered by the current request—it does not require detailing the contents of prior interceptions. *United States v. Kail*, 612 F.2d 443, 447 (9th Cir. 1980); *United States v. Florea*, 541 F.2d 568, 575–76 (6th Cir. 1976); *United States v. Kilgore*, 514 F.2d at 500.

The disclosure in the instant case revealed over thirty prior interception orders involving the same persons as the January 29 application. The sheer number of prior interceptions disclosed might cause the issuing judge to inquire further whether the privacy rights of the suspects were being unnecessarily invaded. *See United States v. Bellosi*, 501 F.2d 833, 838 (D.C.Cir.1974). It is undisputed that the authorizing judge has the power under the statute to make further inquiry into the results of prior surveillance. *See* § 2518(2). That authority is in addition to the requirements of § 2518(1)(e) and is exercisable at the discretion of the issuing judge. *See United States v. Kilgore*, 518 F.2d at 501; *United States v. Bellosi*, 501 F.2d at 838. Here the application and affidavit were adequate to comply with the mandate of the statute.[70]

III, Affidavit of Dr. Tom Mullis. *See generally*, Sec. III–B *supra*.

Defendants also contend, without benefit of authority, that the showing of need must meet a higher standard where, as in the April 7 application and order, an oral interception is authorized. We believe that Wacks affidavit, 3 App. I, Wacks Aff. at 104–07, adequately states the need for the continued interception and *addition of oral overhears. The conversations* intercepted to date demonstrated that conversations relevant to the criminal schemes under investigation were taking place in the two offices named and there was no other way to discover the contents of those conversations. Defendants assert that the invasion of privacy is greater, and the expectation of privacy higher, where conversations are taking place within the office rather than over the phone. The issue of whether Dorfman's privacy rights were adequately respected is dealt with fully in our discussion of minimization. It is noteworthy that defendants did not attempt to prove a minimization violation with respect to the oral interception. The evidence presented demon-

strates conclusively that the monitoring agents were cognizant of the need to limit oral interception to conversations related to the authorized objective and did in fact do so. *See* n. 65, *supra*.

**69.** The statute provides that "[e]ach application shall include the following information:

\* \* \* \* \* \*

(e) a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interception of, wire or oral communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application . . .

18 U.S.C. § 2518(1)(e).

**70.** There is disagreement whether, even if we were to find a violation of § 2518(1)(e), suppression would be an appropriate remedy. In *United States v. Abramson*, 553 F.2d 1164 (8th

E

 The final ground upon which suppression is urged is that the government failed to comply with the statutory requirement for seeking permission to use the wiretap evidence gained from its initial investigation for the separate crime which is being prosecuted in the case at bar. The statute provides that before evidence can be used in the prosecution of an offense different from the one named in the original application, a separate application must be made to the court. *See* § 2517(5). As we have already discussed in our prior opinion in this case, the remedy established by Congress for improper "disclosure" within the meaning of § 2517(5) is a civil one. *See United States v. Dorfman*, 532 F.2d at 1137 (and cases cited therein). While suppression is appropriate where the government fails to secure an order permitting it to use the evidence in a separate prosecution, *see United States v. Brodson*, 528 F.2d 214 (7th Cir. 1975); *United States v. Marion*, 535 F.2d 697 (2d Cir. 1976), that situation is not before us.[71] Here it is undisputed that the government submitted a § 2517(5) application to Chief Judge Parsons and received an order permitting use of the evidence in the case at bar before the evidence was "disclosed." In so doing, the government complied with the requirements of the statute.

 Defendants argue, however, that the material submitted to Chief Judge Parsons in support of the § 2517(5) application was inadequate to permit a finding that the interception was "otherwise in accordance with the provisions of this chapter." *See* § 2517(5); Memorandum of Points and Authorities of Defendants Williams and O'Malley at 89–99. The statute, contrary to defendants' assertions, does not permit this court to make a de novo review of the sufficiency of the evidence presented to Chief Judge Parsons under § 2517(5). Suppression of evidence is only authorized pursuant to § 2515 or 2518(10). Since an order permitting the use of the evidence in this proceeding was obtained, there can be no argument that "disclosure of the information would be in violation of this chapter" under § 2515.[72] All the statute requires on its face is that an order be secured and that was done in the case at bar. Nor can an insufficient showing under § 2517(5) render the interception "unlawful" under § 2518(10). That section of the statute focuses on the lawfulness of the *interception*, not the subsequent acts of the government. Whether the interception of the conversations the government seeks to use in this case was lawful is discussed in full and decided in the minimization section of this opinion, Section VII–B, *supra.* We shall not repeat that discussion here.

In short, the statute sets up the scheme by which we judge the admissibility of evidence. The decision required by § 2517(5)

Cir. 1977), the court found that the government had failed to make an adequate statement of prior surveillance but held that, under the standards established in *Donovan*, suppression was not required. *Id.* at 1169–70. Thus, the *Abramson* court held that § 2518(1)(e) was not one of the statutory provisions that "directly and substantially" implement congressional intent to limit the use of wire interception as those terms are defined in *Donovan* and *Giordano*. *See Donovan*, 429 U.S. at 432–37, 97 S.Ct. at 670–73; *Giordano*, 416 U.S. at 527, 94 S.Ct. at 1832. The District of Columbia Court of Appeals in *Bellosi*, decided before *Donovan* but after *Giordano*, reached the opposite conclusion. 501 F.2d at 840–41. In light of our determination that no violation of the section is present in the case at bar, we do not reach the question of whether suppression is required by the statute.

71. As we indicated previously, suppression was required in *Brodson* because the failure to obtain an order permitting the use of the wiretap evidence taints the grand jury itself by exposing it illegally to wiretap material. *See Dorfman*, 532 F.2d at 1137 n. 19. While *Brodson* discusses generally the purpose of § 2517(5), there is no suggestion that where an order *is* obtained the reviewing court is permitted to conduct an inquiry into the sufficiency of the evidence which is not otherwise permitted by the statute.

72. Suppression was appropriate in *Brodson* precisely because no order permitting the use of the evidence before the grand jury was entered and therefore its disclosure was unlawful and the fruits of the disclosure, in that case the indictment itself, were obtained in violation of the statute.

is to be made by the judge to whom the application is submitted.[73] Our review is limited to the lawfulness of the interceptions under the terms of the statute and the Constitution. The sufficiency of the evidence under § 2517(5), so long as an application is made and an order entered, is not for us to decide.[74]

## CONCLUSION

Defendants' motions to suppress have raised many important questions under the fourth amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968. We believe we have given thoughtful consideration to each of them. For the reasons stated herein we have concluded that except for defendant Dorfman's motion to suppress the Breen-Peick conversation intercepted on April 10, 1979,[75] all of the motions to suppress should be denied.

Defendants' motions to suppress are denied. Cause held for trial September 7, 1982.

---

73. The decision under § 2517(5) is to be distinguished from the "necessity" showing under § 2518(1)(c) which we review in Part VII, C *supra* because the latter is a prerequisite to the wiretap order and failure to meet its terms would render the *interception* unlawful within the meaning of § 2518(10).

74. The government does not argue that we lack the power to review the sufficiency of the evidence presented to Chief Judge Parsons in the § 2517(5) applications; it urges instead that Chief Judge Parsons had at his disposal all of the information necessary to make the required finding even on defendants' view of the statute. We are persuaded that the government's view of the evidence is the correct one and that defendants' argument places form over substance. *Chief Judge Parsons is the same judge who authorized the initial application in the* case and each of the extensions. The progress reports and logs, as well as complete transcripts of many of the conversations covered by the § 2517(5) application for the instant offense, had already been reviewed by him in another context. We assume that, insofar as the court required information in addition to that contained in the application, the readily available material was consulted. *See United States v. Masciarelli*, 558 F.2d 1064, 1068 (2d Cir. 1977); *United States v. Marion*, 535 F.2d at 703. The only thing which would be accomplished by submitting evidence of how the conversations were intercepted along with the application would be to overburden the judge by repeating that which he already had at the time the order was requested and issued.

75. *See* footnote 61, *supra*.